CALIFORNIA PACKING CORPORA-
TION, a corporation, et al.,
Libelants,

v.

THE EMPIRE STATE, her engines, boil-
ers, tackle, apparel and furniture (Voy-
age 58), States Marine Corporation of
Delaware, et al., Respondents.

PRODUCERS COOPERATIVE PACKING
CO., a corporation, et al., Libelants,

v.

STATES MARINE CORPORATION OF
DELAWARE, a corporation, and THE
EMPIRE STATE, her engines, tackle
and machinery, Respondents.

Nos. 27472, 27466.

United States District Court
N. D. California, S. D.

Jan. 5, 1960.

———◆———

McCutchen, Doyle, Brown & Enersen, Russell A. Mackey, Bryant K. Zimmerman, San Francisco, Cal., for libelants California Packing Corp. and others.

Derby, Cook, Quinby & Tweedt, San Francisco, Cal., for libelants Producers Cooperative Packing Co. and others.

John Hays, George L. Waddell, Dorr, Cooper & Hays, San Francisco, Cal., for respondents.

ROCHE, District Judge.

These two causes of action, having been consolidated, were brought for damages to canned goods and dried fruit shipped aboard the S.S. Empire State from various ports on the west coast to various ports on the gulf coast early in 1956.

Between January 7 and January 22, 1956, the Empire State loaded cargo—including that owned by libelants which is the subject of these actions—for shipment to the gulf coast via the Panama Canal and Havana. She loaded cargo at Seattle, Washington, on January 7 and 8, during which time the weather was cloudy with temperatures generally in the 40's. She arrived at Vancouver on January 9 and continued loading cargo there until the morning of January 11. The log records almost continuous light rain or drizzle while at Vancouver, with temperatures again in the 40's. On January 13 the Empire State docked at Encinal Terminal in Alameda, California and loaded canned goods through the 14th. It rained steadily both days, with temperatures in the 50's, and the log records that all loading was suspended for six hours on January 14 due to heavy rain. The Empire State moved to Stockton on the 15th and loaded cargo for two days. There is no record in the ship's log of precipitation while in Stockton, but one daily hatch log describes the "weather conditions" as "rain." The temperature continued to hover about the 50's. The vessel returned to Alameda on January 17, loaded cargo for a few hours in what is described as cloudy weather, and departed for San Diego the same day, arriving there on January 19. The Empire State loaded mostly deck cargo in San Diego. No rain was recorded and temperatures were in the high 50's. Arriving at Long Beach on January 20, the vessel loaded cargo for two days in weather ranging from haze to light rain with temperatures in the 50's and 60's. Early on January 22 she departed Long Beach bound for the Canal Zone.

It is recorded in the log that orders were received on January 8 not to ventilate the cargo spaces during the voyage in order to prevent sweat damage. It is also noted that hatch tents were rigged when loading in rainy weather. However, no hatch tents were rigged in Stockton. The log records frequent accumulations of water in the bilges while loading and during the voyage, especially in Number 3 hold.

Throughout the voyage temperatures consistently reached the 80's and the weather was humid as well as warm, with some rain. The Empire State arrived at Havana on February 3. Cargo was discharged commencing on the 4th, and on the 6th, wet cartons were removed from the lower tween decks in the square of Number 3 hatch. There was light rain on February 7. The temperature reached the 90's every day the Empire State was at Havana. On February 10 she departed for Tampa, arriving the next day. The stevedores came aboard on the 12th and unloaded cargo in weather that is described as clear with temperatures in the high 50's and low 60's. Captain Jones, a marine surveyor, came aboard to survey the damaged cargo and it is noted that a considerable amount of wet cargo (canned goods) was found in the square of Number 3 hatch. Libelants' damages consisted of rust and spoiled labels on the canned goods and mold and dampness in the dried fruit.

The rights and duties of the parties are set forth in the Carriage of Goods by

Sea Act of 1936, 46 U.S.C.A. §§ 1300–1315. Libelants contend that respondent fell short of its obligation to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." Respondent alleges that libelants failed to establish a prima facie case, and furthermore, that the loss is attributable to one or more of the following excepted causes: peril of the sea, Act of God, inherent vice, insufficiency of packing, some other cause arising without the fault of the carrier or its agents.

 In substance, it is respondent's position that libelants' damages were caused by a not unusual shipboard phenomenon known as "sweat," i. e., condensation which occurs when the temperature of the air falls below its dew point. It is evident that when canned goods are transported on a winter voyage from a cool, rainy climate to a warm, moist one —the shipper and carrier having followed the standard and customary practices of their trades, but nothing more—the danger of sweat is present and the probability of some damage resulting therefrom not unlikely. But sweat is considered to be a peril of the sea only when all available and reasonable precautions are taken to avoid it. If the damage could have been avoided by the exercise of proper care, then the carrier is liable. Clark v. Barnwell & Ravenal, 1851, 12 How. 272, 53 U.S. 272, 13 L.Ed. 985; Wessels v. The Asturias, 2 Cir., 1942, 126 F.2d 999. The law casts the burden of explanation upon the carrier. He is prima facie liable for the damage unless he can affirmatively show that the cause is one for which the law does not hold him responsible. Schnell v. The Vallescura, 1934, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373; Schroeder Bros., Inc. v. The Saturnia, 2 Cir., 1955, 226 F.2d 147; Manhattan Fruit Export Corp. v. Royal Netherlands Steamship Co., D.C.S.D. N.Y.1958, 175 F.Supp. 771. Hence, to avoid liability, respondent must prove that all reasonable precautions were taken to avoid the damage.

Libelants contend that defects in respondent's loading and ventilating procedures caused their cargos to become wet from sweat and rain, the damage occurring as a consequence thereof. Respondent presented a number of witnesses who testified that the general practices employed by respondent with respect to the loading, stowing and transporting of canned goods are customary and proper. With this the court takes no issue. But these practices must be accompanied by the exercise of discretion in their application before the carrier has fulfilled its obligation. Intercoastal voyages in the winter time are inordinarily hazardous operations with respect to the safety of the cargo and impose heavy responsibilities upon the carrier. In a situation fraught with the possibility of small errors causing large amounts of damage, respondent—if it is to escape liability for the heavy damage which in fact ensued—must come forth with a clear and convincing demonstration that it is blameless. Concededly, the burden upon the carrier is cumbersome; but it is put there by law.

The explanation offered by respondent was neither clear nor convincing. Respondent spent much time establishing that the practice of sealing holds under the conditions that prevailed is acceptable but did little to persuade the court that the Empire State's holds were, in fact, adequately sealed, in spite of libelants having raised substantial doubts on that issue. The Chief Mate was unable to testify that anything had been done to seal the exhaust vents. Both he and the Captain were unfamiliar with the practice of sealing the holds to prevent sweat. Furthermore, there was no explanation as to why the Empire State failed to carry the instruments which are available to measure the dew point in the holds. Their use might have resulted in more flexible—and more satisfactory—ventilation.

It was incumbent upon respondent to demonstrate that its precautions while loading in the rain were adequate to preclude substantial amounts of moisture

from entering the holds. It is recorded in the log that at 1100 hours on January 14, loading stopped in Numbers 1 and 3 lower holds and commenced in Numbers 1 and 3 tween deck holds, and tarpaulins were spread over the hatches in the lower holds to keep out rain. The log records steady rain from 1600 hours the previous day. What was there—other than hatch tents which apparently were not satisfactory and a brief suspension in loading—to keep out the rain which fell for 19 hours before the tarpaulins were spread? The use of two hatch tents at Number 3 hold resulted in twice the usual number of openings for rain to enter. Captain McLaughlin, master of the Empire State, admitted that rain had been getting into the lower holds. Captain Noyes, employed by States Marine, referred in his testimony to the use of sawdust in the holds to soak up water, indicating that a significant amount was getting in. There are log entries that wet cargo was discovered at Tampa and Havana in the square of Number 3 hatch. Respondent did not attempt to account for the fact that water accumulated in the bilges—especially Number 3 hold—from time to time; the possibility that these accumulations were composed in part of rain water cannot be excluded. And there was testimony that the dried fruit would not mold unless subjected to severe wetting and allowed to remain in that condition for in excess of two weeks. The court is not persuaded that respondent's loading procedures in this instance were satisfactory to meet its obligation of due care.

■ On the other hand, respondent failed to demonstrate that the extraordinary amount of damage incurred could be attributed to the peril of sweat that would have remained if all reasonable precautions had been taken. There was no evidence that the weather which prevailed while loading and during the voyage varied from the atmospheric conditions which would ordinarily be expected at this time of year, which conditions do not normally result in sweat damage of this magnitude. Hence, respondent not only failed to convince the court that its own conduct was blameless, but in addition, failed to establish a reasonable alternative to its own negligence as a probable cause for the damage. As the Supreme Court stated in Schnell v. The Vallescura, supra [293 U.S. 296, 55 S.Ct. 197], " * * * the carrier is charged with the responsibility for a loss which, in fact, may not be due to his fault, merely because the law, in pursuance of a wise policy, cast on him the burden of showing facts relieving him from liability." The court cannot conclude from the evidence that respondent has carried the burden of proving that its fault did not contribute to the damage. Standard Brands v. Thos. & Jno. Brocklebank, D. C.S.D.N.Y.1948, 81 F.Supp. 670.

■ Respondent directs attention to the established rule that where inherent vice or insufficiency of packaging may have been the cause of cargo damage, libelant, to establish his cause of action, must prove that the goods were in proper order when delivered to the carrier. The Niel Maersk, 2 Cir., 1937, 91 F.2d 932, certiorari denied, 1937, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582. Libelants' "clean" bills of lading are prima facie evidence of good order and condition. Kupfermann v. United States, 2 Cir., 1955, 227 F.2d 348; Karabagui v. The Shickshinny, D.C.S.D.N.Y.1954, 123 F.Supp. 99; Yeckes-Eichenbaum, Inc. v. Texas Mexican Ry. Co., 5 Cir., 1959, 263 F.2d 791. If there is an affirmative showing of inherent or concealed vice in the goods which might have caused their damaged condition, the shipper may no longer rely on the "apparent good order and condition" evidenced by the bill of lading. Albers Bros. Milling Co. v. Hauptman, 9 Cir., 1938, 95 F.2d 286, 287. Or where there is no evidence of negligence on the part of the carrier and the possibility of concealed vice in the goods is very strong, additional proof from libelant may be required. Thomas Roberts & Co. v. Calmar S. S. Corporation, D.C.Pa.1945, 59 F.Supp. 203. But when, as in the instant case, there is evi-

dence of negligence on the part of the carrier adequate to explain the damage and there is no substantial evidence to rebut the shippers' prima facie showing of good order and condition, the shipper need go no further. Kupfermann v. United States, supra; Karabagui v. The Shickshinny, supra. Those cases requiring an affirmative showing of carriageable condition deal with products much less uniform and far more susceptible to inherent vice than standard canned goods. The quantity and variety of goods that were affected—45% of the canned goods on board including consignments from nine different libelants—make the possibility of inherent vice remote. Furthermore, the principal cause of the damage here is not unknown. It is sweat, a phenomenon rarely if ever attributable to any inherent or concealed vice in the goods. The two characteristics which might have contributed to the damage—wet cartons and excessive coldness—are not concealed vices. They are apparent qualities on which the "clean" bills of lading are conclusive. Respondent offered testimony that libelants' canning and packaging techniques may not be the ultimate as far as safety of the goods during transit is concerned. But he failed to show that they were not adequate to put these goods in reasonably good order and condition to withstand the ordinary hazards of ocean voy-ages; the court cannot say that more is required. Lastly, with regard to the dried fruit, there was affirmative evidence that its moisture content was ideal for shipping.

■ Respondent complains that libelants did not prove their damages satisfactorily. However, there is no dispute at all that portions of libelants' cargos did suffer damage and, with one exception, respondent offered no evidence raising substantial doubts as to the correctness of the amounts claimed. In the absence of rebuttal the court will allow libelants' figures to stand. Manhattan Fruit Export Corp. v. Royal Netherlands Steamship Co., supra. The one exception is the claim of Hunt Foods, which claim is in part contradicted by the testimony and survey report of Captain Jones. That claim appears to be excessive in the amount of $112.

■ Although it is probable that a portion of libelants' damages is attributable to an unavoidable peril of sweat, in the absence of a showing by respondent as to what portion is so attributable, it must bear the entire loss. Schnell v. The Vallescura, supra.

Each libelant is entitled to judgment for its full claim, with the exception of Hunt Foods which is entitled to judgment for its reduced claim as determined above. The amounts are as follows:

Libel No. 27472

| | |
|---|---|
| California Packing Corporation | $11,895.11 |
| Hollister Canning Company | $ 505.62 |
| Hunt Foods, Inc. | $ 805.72 |
| Richmond-Chase Company | $ 1,510.70 |
| United Growers, Inc. | $ 365.45 |

Libel No. 27466

| | |
|---|---|
| Producers Cooperative Packing Co. | $ 68.69 |
| Stokely-Van Camp, Inc. | $ 1,537.70 |
| Springbrook Packing Co. | $ 116.97 |
| Winn-Dixie Tampa, Inc. | $ 1,820.00 |

Libelants will file Findings of Fact and Conclusions of Law in accordance with the foregoing.