The DAIDO LINE, Appellant,

v.

THOMAS P. GONZALEZ, CORPORATION, Appellee.

No. 17286.

United States Court of Appeals
Ninth Circuit.

Feb. 26, 1962.

Lillick, Geary, McHose, Roethke & Myers, Lawrence D. Bradley, Jr., David Brice Toy, Los Angeles, Cal., for appellant.

Wright, Wright, Goldwater & Mack, Loyd Wright, Edgar R. Carver, Jr., Robert E. Aitken, Andrew J. Davis, Jr., Los Angeles, Cal., for appellee.

Before JERTBERG and BROWNING, Circuit Judges, and TAYLOR, District Judge.

BROWNING, Circuit Judge.

The Thomas P. Gonzalez Corporation sued the Daido Line in admiralty alleging damage to a shipment of garlic. The District Court found: that the garlic was received by the carrier in good order and condition and outturned at destination badly damaged; that the carrier failed to use due care in keeping and ventilating the cargo during the voyage; that these failures proximately caused

the damage to the garlic; and that no part of the damage was caused by act or omission of the shipper or inherent vice of the cargo. On an examination of the whole record we conclude that the findings with respect to liability are not clearly erroneous. However, we vacate the judgment and remand for a recomputation of damages.

## I

The libel alleged that the Gonzalez Corporation shipped 4,400 sacks of garlic in good order and condition aboard Daido's vessel, the Korai Maru, then lying at the Port of Los Angeles; and that the cargo was discharged in the Port of Havana badly damaged, impaired in value and slack in weight, in breach of Daido's duty and to the damage of Gonzalez Corporation. Daido's answer denied that the garlic was in good order and condition when shipped, and alleged that the cargo was outturned in Havana in the same condition as received in Los Angeles except for normal deterioration. As affirmative defenses Daido alleged, so far as pertinent, that it exercised due diligence in caring for the cargo aboard the Korai Maru, and that the damage to the cargo, if any, arose from "inherent defect, quality, or vice of the goods."

After trial of these issues, the District Court filed findings of fact and conclusions of law, and entered judgment for Gonzalez Corporation in the sum of $33,996.77, from which Daido appeals.

The action is governed by Cogsa (the Carriage of Goods by Sea Act [1]). Under Cogsa the shipper makes out his prima facie case, as he did before its enactment, by proving receipt by the carrier in good order and delivery at destination in bad. The burden of explanation falls upon the carrier. However,

Cogsa relieves the carrier from liability for damages arising from certain causes, and the carrier may meet the shipper's prima facie case by showing that the damages were attributable to such a cause. But although the carrier demonstrates that the damage is in part attributable to a cause for the effects of which the carrier is exonerated by Cogsa, the shipper may nonetheless recover if it can show that the carrier's negligence contributed to the result. The burden then falls upon the carrier to segregate the portion of the damage due to the excepted cause from that resulting from its negligence, at the risk of responding for all—a burden which may be difficult if not impossible to meet.[2]

As noted, the carrier's answer in the present case included both a denial that the garlic was in good condition when shipped, and an affirmative assertion that the damages were due to inherent vice, a cause for the effects of which the carrier was relieved of liability by Cogsa.[3] In such a case the attempt to establish liability by a step-by-step progression through the accepted scheme of shifting burdens of proof may present difficult problems. Theoretically, both parties have the burden of proof on the same issue—the condition of the cargo. The shipper is obliged to establish that the garlic was in good condition to make its prima facie case, but the carrier is burdened with proving that the garlic suffered from an inherent defect in order to bring itself within the statutory exception from liability.

Thus in the usual cargo-damage case the shipper makes a showing of good condition on shipment sufficient for its prima facie case by introducing a "clean" bill of lading.[4] But this is not always true in a case involving inherent vice.

---

1. 49 Stat. 1207, 46 U.S.C. §§ 1300–1315, 46 U.S.C.A. §§ 1300–1315.

2. See Schnell v. The Vallescura, 293 U.S. 296, 305–306, 55 S.Ct. 194, 79 L.Ed. 373 (1934); United States v. Apex Fish Co., 177 F.2d 364, 368–369 (9th Cir. 1949).

3. 46 U.S.C.A. § 1304(2) reads: "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from * * * wastage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods * * *."

4. On demand of the shipper, the carrier must issue a bill of lading showing, among other things, the apparent order

It is clear, at least in this circuit, that where there is affirmative evidence that damage was caused by heat resulting from an internal condition of the cargo which could not be observed by external inspection, a clean bill of lading (which establishes only apparent good condition) is not alone enough to support the shipper's prima facie case.[5] Beyond this, the questions which may arise in an inherent vice case are many and the answers sometimes obscure.[6] However, they are not presented in the circumstances of the present case. Whatever may have been its precise legal obligation, the Gonzalez Corporation undertook to establish at the trial, and to sustain on appeal, the position that the garlic was in fact wholly free of inherent defect when shipped, and that the damage which it sustained arose wholly from the negligence of Daido. The District Court found that the shipper sustained the burden which it undertook.[7]

The position of carrier is that a legal question on the issue of liability nonetheless remains in the case. The appellant points to no specific ruling of the District Court which it asserts to be erroneous, and we find none. The carrier's argument seems to be that the evidence established that on shipment a substantial portion of the garlic was "generally slightly damp," that the uniform testimony of the expert witnesses was that garlic which is not thoroughly dry will deteriorate under the ordinary conditions of a sea voyage, and that, on this evidence, the defense of inherent vice was so clearly established that judgment for the shipper can be explained only as based upon an erroneous application of the law by the District Court. In the absence of an erroneous legal ruling by the trial court, the argument necessarily returns to an attack upon the findings, and we turn to them to determine whether they are clearly erroneous.[8]

and condition of the goods. 46 U.S.C.A. § 1303(3). The bill of lading is prima facie evidence of receipt of the goods by the carrier in the condition described in the bill of lading. 46 U.S.C.A. § 1303(4).

5. Albers Bros. Milling Co. v. Hauptman, 95 F.2d 286 (9th Cir. 1938). See also The Niel Maersk, 91 F.2d 932 (2d Cir. 1937), cert. denied 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582. But see Brown & Williamson Tobacco Corp. v. The SS Anghyra, 157 F.Supp. 737, 748–749 (E.D. Va.1957), modified on other grounds, sub nom. Hellenic Lines, Ltd. v. Brown & Williamson Tobacco Corp., 277 F.2d 9 (4th Cir. 1960), cert. denied 364 U.S. 879, 81 S.Ct. 168, 5 L.Ed.2d 102.

6. See generally 27 Texas L.Rev. 525 (1949). As a practical matter, the most important problem arises when the carrier's negligence concurs with an inherent vice in causing the damage. In this general situation, when does the (ordinarily impossible) burden of segregating the damages fall upon the shipper, and when on the carrier? Compare Schnell v. The Vallescura, 293 U.S. 296, 305–306, 55 S.Ct. 194, 79 L.Ed. 373, supra, with The Niel Maersk, 91 F.2d 932 (2d Cir. 1937), supra. The comment on this point in Albers Bros. Milling Co. v. Hauptman, 95 F.2d 286, 289 (9th Cir. 1938), is, of course, dictum.

7. The court found that the garlic was "shipped and placed on board the steamship Korai Maru * * * in good order and condition" under an agreement to carry the garlic "under 'ventilated stowage,'" and that it was "discharged * * * not in like good order and condition as when shipped, but seriously injured, badly damaged, slack in weight and impaired in value." The court further found that the carrier "failed to use due and proper care to carry, keep, ventilate and care for said shipment of garlic while on board * * * and said failures proximately caused said damages * * *." Finally, the court found that "it is not true that any part of said damages * * * was caused by * * * inherent defect or vice in or of said garlic." The court concluded that the carrier "had a duty to Libelant to ventilate said garlic during the transportation thereof to Havana * * * and 'failed to perform that duty,'" and that the shipper was entitled to recover the amount of its damages. The court also found that the carrier "failed to properly man the steamship Korai Maru." We dispose of the case without reaching this finding.

8. This, of course, is the scope of our review. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Pacific Tow Boat Co. v. States Marine Corp. of Delaware, 276 F.2d 745, 752 (9th Cir. 1960).

## II

Evidence relating to the origin, processing, and delivery of the garlic to the carrier provided substantial support for the conclusion that the garlic was mature, well cured, and dried at the time of shipment. Although there was contrary testimony, its source and substance was such that the court may well have accorded it little weight, especially since it appeared that, after a deliberate consideration of the available information, the agents of the carrier issued a clean bill of lading.

In addition to this general testimony, the shipper produced inspection certificates reflecting the results of an examination of the garlic shortly before shipment by an inspector of the United States Department of Agriculture. These certificates reflected the results of a thorough examination of the cargo, contemporaneous with the shipment, by a qualified and disinterested person, and both parties properly accorded them great weight. They disagreed as to their meaning.

The carrier emphasized the fact that some of the garlic was not graded "U. S. No. 1," and that other portions of the garlic which were graded "U. S. No. 1" were described in the certificates as "generally slightly damp," or "slightly damp." It pointed to expert testimony that garlic "should be mature, it should be well cured, and if it is well cured it will then be dry and it should be proper for storage." The shipper, on the other hand, relied upon the fact that the portion of the garlic not graded "U. S. No. 1" was deficient because of mechanical damage or other defects unrelated to its maturity or moisture content, and that all of the garlic was either expressly described in the certificates as "well cured and dry" or was graded "U. S. No. 1" which, according to the official grade description, meant that it was "mature and well cured," that is, that it had "reached that stage of development at which the garlic is firm and sufficiently dried so as not to be soft and spongy." This would indicate that the description of a portion of the garlic graded "U. S. No. 1" as "generally slightly damp" referred not to a hidden defect or inherent vice of the garlic, but to surface moisture.[9] As to the latter there was testimony that surface moisture gathered readily when garlic was moved from cool storage to warm air, and, though it caused "slight superficial mold," this mold did not damage the garlic, and would disappear with proper ventilation.[10] On a careful examination of the inspection certificates and

9. The garlic was packaged in open mesh bags, and surface moisture should have been as observable to the carrier as to the shipper. While it need not concern us in the circumstances of the present case, the reason for the rule of Albers Bros. Milling Co. and The Niel Maersk, supra, n. 5, is not present if the deficiency in the cargo is apparent. As to apparent defects, a clean bill of lading is an admission by the carrier sufficient to sustain the shipper's evidentiary burden of showing shipment in good order and condition. "The statutory policy permitting a reliance upon bills of lading is an important one and should not be undermined * * *" by excusing a failure to take exception to a condition which would be readily observable on inspection by the carrier. Proof of actual good condition on delivery is required only "where the goods themselves contain some basic, inherent, and hidden defect * * *." Kupfermann v. United States, 227 F.2d 348, 350 (2d Cir. 1955). See also The Ciano, 69 F.Supp. 35, 36 (E.D.Pa.1946); California Packing Corp. v. The Empire State, 180 F.Supp. 19, 23 (N.D.Cal.1960); 46 U.S.C.A. § 1303(3) (c) and (4). Where suit is brought by a consignee of goods who has accepted a draft in reliance upon a clean bill of lading, the policy is even more pressing. Accordingly, the carrier is estopped to plead the defense of inherent vice when it has issued clean bills of lading on cargo which showed outward signs of internal damage at the time of shipment. The Carso, 53 F.2d 374 (2d Cir. 1931), cert. denied Navigazione Libera Triestina v. Molinelli Giannusa & Rao, Inc., 284 U.S. 679, 52 S.Ct. 140, 76 L.Ed. 574. Cf. Freedman v. The Concordia Star, 250 F.2d 867 (2d Cir. 1958).

10. Counsel for the carrier received an affirmative answer when he asked shipper's witness, testifying through an interpreter, whether garlic would rot if

all of the expert testimony, we conclude that the more reasonable interpretation of the certificates is that adopted by the District Court, that the Department of Agriculture inspector found the cargo free of inherent vice, of internal moisture or delay, "waxy breakdown," or similar condition[11] which might render it unfit to withstand the contemplated voyage.

Of course the garlic was not perfect. The certificates reflected decay, mechanical damage, and mold, though generally within accepted tolerances for the U. S. No. 1 classification. There was testimony that garlic is inherently perishable and that these defects might in some measure accelerate the natural deterioration through age. But there was also testimony that all garlic was subject to these deficiencies in some degree, and that, properly cared for, this cargo would have survived the trip.[12] A higher standard of proof than this would exclude all ordinary perishable cargo from the rule imposing liability on the carrier for unexplained deterioration of goods in its care.

### III

■ The bills of lading were marked "ventilated stowage," and in any event there was a clear duty on the carrier to properly stow and ventilate the cargo in accordance with the need of the particular cargo.[13] We have concluded

that the District Court's findings that the carrier failed to use due care in ventilating the garlic, and that this failure rather than any inherent defect in the cargo itself caused the damage, are not clearly erroneous.

■ The thrust of the evidence was that inadequate ventilation in No. 5 Hatch in which the garlic was stowed resulted in heavy "sweating" or condensation of moisture which in turn led to a deterioration of the garlic. Sweat is a common marine hazard, and is a "peril of the sea" for which the carrier is not responsible, provided reasonable precautions are taken to avoid it.[14] However, the carrier is liable if negligent handling of the ship's ventilation contributed to the sweat.[15]

There was evidence from which the trial court might well have concluded that through inadvertence a hatch was selected for the storage of the garlic which was equipped with mushroom ventilators rather than with cowl ventilators, which would have provided better ventilation since they could have been trimmed to the wind. There were two cowl ventilators located over No. 5 Hatch which most of the ship's officers believed ventilated the hold beneath, and these were kept turned to the wind in an effort to improve the draft. There was evidence, however, that the ducts from these cowl ventilators led not to No. 5 Hatch

---

shipped "not well dried and cured, but * * * generally slightly damp." The question obviously assumed that these two conditions were equivalent. When the witness was recalled and the question clearly put to him, he testified that garlic in the condition described in the certificates would safely withstand a voyage of the length here involved if properly ventilated.

11. The inspection included cutting into a sampling of the garlic to detect such internal defects, and the testimony was that the inspection certificates disclosed "none whatsoever."

12. The record indicates that large quantities of garlic were carried by ship to Cuba from Spain, Italy, Japan, Chile, Argentina, and Peru, as well as from

California. Gonzalez Corporation alone shipped one to two million pounds a year over a 30-year period, and two and a half million pounds in the three-month period preceding trial.

13. Schnell v. The Vallescura, 293 U.S. 296, 302, 55 S.Ct. 194, 79 L.Ed. 373 (1934); Philippine Sugar Centrals Agency v. Kokusai Kisen Kabushiki Kaisha, 106 F.2d 32, 35–36 (2d Cir. 1939); Schroeder Bros., Inc. v. The Saturnia, 226 F.2d 147, 149–150 (2d Cir. 1955); KNAUTH, Ocean Bills of Lading (4th Ed. 1953) 198–200, and cases cited; 46 U.S.C.A. § 1303(2).

14. Clark v. Barnwell & Ravenel, 12 How. 272, 53 U.S. 272, 13 L.Ed. 985 (1851).

15. Wessels v. The Asturias, 126 F.2d 999 (2d Cir. 1942).

but to the adjacent hatch. Further, the testimony of two of the ship's officers and the entries in the ship's log were to the effect that No. 5 Hatch was kept closed during the night in fair weather as well as in foul.[16] This was contrary to the instructions given the ship's officers which, as we read them, were to open No. 5 Hatch at sea except as weather forbade. It was reasonable for the trial court to conclude that the actual ventilation of the garlic was less than had been planned. The shipper also plausibly suggests that opening the hatch in the morning and closing it at night produced sudden changes in the temperature of the air in the hold, causing sweat to form. Finally, during a portion of the voyage the garlic was covered with paper in an effort to protect it from sweat which might drop from the hatch coaming. Though the motive was good, the consequences could only have been bad since the paper interfered with the circulation of air through the cargo, and served to retain heat.

The record is clear that sweat did in fact accumulate in No. 5 Hatch. All of the ship's officers so testified, although disagreeing as to the frequency and amount. The placing of a protective layer of paper over the garlic was mute testimony to the same effect. Entries in the log reflect the employment of the crew to wipe off the accumulation of sweat in No. 5 Hatch on two occasions. A Ship's Protest filed by the ship's officers on arrival in Havana admitted the possibility of sweat damage, although attributing it to bad weather.[17] In the context of the case, it was reasonable for the District Court to conclude that the admission of sweat damage contained in

this document was to be accorded more weight than the self-exculpatory explanation of its origin.

The ship's officers testified that the garlic was outturned in Havana in the same apparent condition as when loaded. However, the shipper's agent who met the incoming cargo found it wet, fermented, and spoiled. The importers for whom it was intended examined the garlic and refused to accept it. The shipper's agent notified Lloyd's and the shipper that the cargo had become wet and suffered extensive damage. A Lloyd's surveyor reported that the general appearance of the shipment "was not good," that a process of decay had set in, and that there was considerable loss in weight. Lloyd's concluded that the damage resulted from excessive heat. An expert produced by the carrier testified that the loss of weight suffered by the garlic was within the normal range, but there was strong testimony to the contrary, and the other, objective circumstances surrounding the event also pointed in the opposite direction. When sold, the garlic realized a total net return far below the apparent market for U. S. No. 1 garlic, and the wide range of prices obtained for various lots indicated a substantial deterioration of parts of the cargo relative to the rest.

On this evidence it was entirely reasonable for the District Court to conclude that the garlic was outturned in a damaged condition and that the events aboard ship provided an ample explanation for the condition in which the garlic was discharged, thus offering further support for the conclusion that the garlic was delivered to the vessel in good order and condition.

16. The District Court was not compelled to accept appellant's contention to the effect that the officers, who kept the log in English and testified in English without the aid of an interpreter, had not meant what they had said.

17. The Ship's Protest states that a storm encountered in transiting the Caribbean required the closing of ventilators overnight, and concluded, with specific ref-

erence to No. 5 'tween deck and its cargo of garlic: "[B]ecause we met with bad weather during the voyage, although we paid close attention to the ventilation— although attention was paid to the ventilation, I am afraid that there may be sweat damage, wet damage and other and it is possible [there] may be unforeseen damage."

■ The carrier contends that the trial court's finding that no part of the damage aboard ship was caused by inherent vice is necessarily clearly erroneous since garlic is perishable in nature and inherently susceptible to deterioration if shipped damp. To the extent that this argument depends upon the assumption that the surface of the garlic was "generally slightly damp," we have dealt with it earlier. To the extent that it depends upon an unarticulated assumption that the perishability of garlic as such is an inherent internal vice which invariably subjects the cargo owner to the burden of proving that none of the damage incurred in transit resulted from normal decay, it is also clearly untenable. The condition of any perishable commodity will change somewhat over the period of the voyage, and where the perishable commodity is one which is shipped fully matured, as garlic is, the change is likely to involve a degree of deterioration. The findings of the trial court are to be read as determining that damage occurred which exceeded normal deterioration, and that the preponderance of the evidence was that the excessive deterioration resulted not from the cargo's inherent perishability but from the carrier's negligence. The calculation of damages begins with the fair market value of the product at the time and place of intended arrival in the condition in which it would have arrived save for the carrier's negligence.[18] This market price necessarily includes an appropriate discount for the normal deterioration of the type of product involved during the course of an ordinary voyage when shipped in good order and condition.

## IV

■ We turn finally to the calculation of damage. The case was tried on the proper theory that damages must be calculated on the market price of undamaged goods at the time and place of delivery. This the carrier does not dispute, but it argues that the trial court decided the case instead upon the erroneous theory that damages were to be calculated on the basis of the invoice price. The only finding with respect to the calculation of damages is a simple lump sum award of $33,996.77. The carrier demonstrates that the trial court apparently arrived at this figure by subtracting the net proceeds of the salvage sale from the invoice prices of the garlic to the Havana buyers. However, there was direct testimony that the invoice prices approximated the market price in Havana in mid-June when the shipment arrived. This testimony was supported by the fact that on the salvage sale at least a portion of the garlic brought prices in the range of the invoice prices. Perhaps the record is not as full and clear as might be hoped, but we are not prepared to hold that the trial court's conclusion that the market price for garlic in good condition in Havana at the time of delivery was the same as the price reflected in the invoices was clearly erroneous.[19]

■ Nonetheless, the judgment must be vacated and the case remanded to the District Court for a recomputation of the damages. In addition to two arithmetical errors in the accounting for the salvage sale which we could correct,[20] it appears possible that the shipper may have been permitted to recover charges which were for the account of the buyers, and commission expenses which it would have incurred if the sale had been consummated, but did not in fact incur. Since the generalized nature of the finding as to damages makes it impossible to determine whether these errors actually oc-

18. Otis McAllister & Co. v. Skibs, a/s Marie Bakke, 260 F.2d 181 (9th Cir. 1958), cert. denied 359 U.S. 915, 79 S.Ct. 584, 3 L.Ed.2d 576; United States Shipping Bd. Emergency Fleet Corp. v. Florida Grain & Elevator Co., 20 F.2d 583 (5th Cir. 1927).

19. We would be especially reluctant to overturn the trial court's finding where, as here, the carrier offered no rebuttal testimony. Compare California Packing Corp. v. The Empire State, 180 F.Supp. 19, 23 (N.D.Cal.1960).

20. A $30 error in favor of the shipper and a $.02 error in favor of the carrier.

curred, the judgment must be vacated.[21]

We have examined the other points urged by the carrier and find them to be without merit.

Vacated and remanded.

---

21. Alexander v. Nash-Kelvinator Corp., 261 F.2d 187, 191 (2d Cir. 1958), modified 271 F.2d 524 (2 Cir. 1959). Compare Farley v. United States, 252 F.2d 85, 88 (9th Cir. 1958).