**FOX AND ASSOCIATES, INC., Plaintiff,**

v.

**M/V HANJIN YOKOHAMA and M/V Kochnev *in rem*, their engines, tackle, apparel, etc.; Hanjin Shipping Company, Ltd., a corporation; DSL Inc., a corporation, Distribution Services, Ltd., a corporation; DSL Transportation, Inc., a corporation, Defendants.**

No. CV 96–5354–RC.

United States District Court,
C.D. California.

Sept. 22, 1997.

Dennis Cammarano, Long Beach, CA, for Plaintiff.

Mark W. Nelson, Michael W. Biard, Keesal, Young & Logan, Long Beach, CA, for Defendant Hanjin Shipping Co., Ltd.

## MEMORANDUM DECISION AND ORDER

CHAPMAN, United States Magistrate Judge.

On August 15, 1997, defendant Hanjin filed a Notice of Motion and Motion for Summary Judgment; supporting memorandum and points of authorities; supporting declaration of Mark W. Nelson, with exhibit; and supporting declaration of Beth Ann Savre, with exhibits. On September 3, 1997, plaintiff filed its opposition to the motion for summary judgment, supporting memorandum of points and authorities; supporting declaration of Dennis A. Cammarano, with exhibits; supporting declaration of Daniel J. Fox, with exhibits; and supporting declarations of Jerry Bruning, James Haas, and Thomas Bischoffer. On September 10, 1997, Hanjin filed a reply to plaintiff's opposition and evidentiary objections to the exhibits attached to the declaration of Cammarano.

This matter was regularly heard on September 15, 1997, before Magistrate Judge Rosalyn M. Chapman. Dennis Cammarano, attorney at law, appeared on behalf of plaintiff. Michael W. Biard, attorney at law, appeared on behalf of defendant Hanjin.

## BACKGROUND

On August 2, 1996, plaintiff Fox and Associates, Inc. ("Fox"), an Illinois corporation, filed an action in admiralty against defendant Hanjin Shipping Co., Ltd. ("Hanjin") and defendants DSL Transportation Services, Inc. (erroneously sued as DSL Transportation, Inc.) and Distribution Services, Ltd. (collectively "DSL"), and the vessels Hanjin Yokohama (Voyage 71) and Kochnev (Voyage 515), under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C.App. §§ 1300 et seq. The complaint sets forth five causes of action: (1) declaratory relief; (2) breach of implied contract; (3) negligence; (4) damage to cargo; and (5) breach of contract.

Common to all causes of action, plaintiff alleges the following facts: On or about August 4, 1995, plaintiff purchased 448 cartons of men's jackets (hereafter "cargo") from Deko Subic International, Inc. ("Deko") in the Philippines. (Complaint, ¶ 8). The cargo was then loaded, consolidated, packed and stowed in container no. HJCU 781996–0. (Complaint, ¶ 9). On or about August 15, 1997, when the cargo was received at Manila,

defendant DSL, the non-vessel operating common carrier, and defendant Hanjin, the ocean carrier and DSL's subcontractor, issued clean bills of lading to plaintiff to transport the cargo on vessels Hanjin Yokohama and Kochnev for delivery to Chicago via Los Angeles. (Complaint, ¶¶ 10–1). The cargo was short delivered, damaging plaintiff, the cargo's owner and consignee, in an amount not less than $36,983.13, which has been demanded of defendants but remains unpaid. (Complaint, ¶¶ 14–15).

The plaintiff seeks a declaratory judgment that all or part of the loss of the cargo was of a transit nature and defendants have a duty to indemnify plaintiff for the loss. The plaintiff also seeks general damages in at least the amount of $36,983.13, prejudgment interest at 10% per annum from August 15, 1995, postjudgment interest at the legal rate, costs, and other relief.

On September 16, 1996, Hanjin answered the complaint and raised twelve affirmative defenses. On September 17, 1996, DSL answered the complaint and raised eleven affirmative defenses and concurrently filed a third-party complaint ("TPC") setting forth claims for relief based on indemnity and contribution against third-party defendants Hanjin, Deko, Manila International Terminal ("Terminal"), Hong Joo Company ("Hong Joo"), E. Bessler & Co. ("Bessler"), MOF Company, Inc. ("MOF") and Royal Cargo Truck ("Royal"). In the third-party complaint, DSL alleges that Deko is a foreign corporation with its principal place of business in the Philippines whose business is consolidating cargo; that Terminal is a foreign business entity with its principal place of business in the Philippines; that Hong Joo is a foreign business entity with its principal place of business in Korea and whose business is consolidating cargo; that Bessler is a domestic business entity with its principal place of business in Illinois whose business is foreign freight forwarding; that MOF is a foreign corporation with its principal place of business in Manila, and which acts as the agent for defendant Hanjin; and that Royal is a foreign business entity with its principal place of business in the Philippines, and who delivered the subject container to South Harbor in Manila. (TPC, ¶¶ 4–9). On October 21, 1996, Hanjin answered DSL's third-party complaint and raised nine affirmative defenses. Some, but not all third party defendants, have been served.

On October 10, 1996, Hanjin filed a cross-complaint against DSL for indemnity and contribution. On November 13, 1996, DSL answered Hanjin's cross-complaint and raised seventeen affirmative defenses.

## DISCUSSION

### I

Fed.R.Civ.P. 56 authorizes the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The standard for granting a motion for summary judgment is essentially the same as for granting a directed verdict. Judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict.... If reasonable minds could differ," judgment should not be entered in favor of the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact," which burden may be satisfied by showing the absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325, 106 S.Ct. 2548, 2552, 2553–54, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir.1982), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). An issue of material fact is one that affects the outcome of the litigation and requires a trial to resolve. *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir.1982). More than a "metaphysical doubt" is required to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

The burden then shifts to the non-moving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. The parties bear the same substantive burden of proof as would apply at a trial on the merits, including plaintiff's burden to establish any element essential to its case. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512; *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989).

## II

The summary judgment documents submitted by Fox and Hanjin establish the following facts: On March 8, 1995, Fox contracted with Hong Joo for the purchase of 5,376 men's MA–1 flight jackets manufactured in the Philippines by a Philippine-based subsidiary of Hong Joo. Fox purchased the jackets pursuant to an irrevocable letter of credit issued on June 30, 1995, as well as the bills of lading, commercial invoices, packing lists and textile visa which subsequently were issued for the jackets. Fox had previously purchased shipments of similar apparel from Hong Joo's Philippine subsidiary, and none of these shipments was delivered to Fox with other than a minor shortage.

The jackets (hereafter "cargo") were stowed in Hanjin container no. HJCU781996–0 ("container") and sealed with seal no. 35332–1 ("seal"). At Deko's behest, on the morning of August 11, 1995, the container, which was in sound condition and the seal intact, was delivered by Royal to Hanjin's agent, MOF, at the port of Manila. On or about August 15, 1995, the container was loaded aboard the feeder vessel M/V Kochnev for shipment to the M/V Hanjin Yokohama for delivery to Chicago via Long Beach. From August 11 to August 15, 1995, the container was at Hanjin's facility at the port of Manila.

On August 15, 1995, Hanjin entered into a bill of lading contract, no. MNLA811027, with Hong Joo, the shipper, to ship the cargo from Manila to Chicago via Long Beach. On the face of the bill of lading, Hanjin noted 448 cartons of general merchandise (men's MA–1 flight jacket) and the weight of the container, 6218 kilograms, which was based solely upon the representations of DSL and the shipper. On the face of the bill of lading, Hanjin also noted: "SHIPPER'S LOAD & COUNT." Although Hanjin had the ability to weigh the container, it did not do so.

The bill of lading contains, *inter alia,* the following relevant provisions:

2. CLAUSE PARAMOUNT

(c) The applicable Hague/Visby/COGSA legislation shall govern throughout the time when the Goods are in the actual or constructive custody of the Carrier. The Carrier takes all reservations possible under the Hague/Visby/COGSA legislation relating to the period before loading and after discharge and while the Goods are in the charge of another carrier.

4. RESPONSIBILITY

(e) The Carrier shall not be responsible for loss or damage to the Goods occurring before receipt of the Goods by the Carrier at the place of receipt or after delivery by the Carrier at the place of delivery;

8. CONTAINERS

(e) If the Carrier's container is delivered sealed by the Merchant to Carrier, this Bill of Lading is evidence of receipt only of the number of containers shown on Bill of Lading and the condition and any particulars of the contents are unknown to the Carrier; ... If such Containers are delivered by the Carrier with the seals intact, such delivery will be full and complete performance of Carrier's obligations hereunder, and the Carriers shall not be liable for any loss or damage to the contents of the containers.

13. DELIVERY

(b) In any case the Carrier's responsibility shall cease when the Goods have been delivered to the Merchant, its agent or subcontractors or otherwise according to law at the place designated by the Carrier. ...

Additionally, the bill of lading contains definitions of certain terms, including Merchant.

On or about September 6, 1995, the container, with the seal intact, was discharged from the M/V Hanjin Yokohama at Hanjin's Long Beach terminal. Thereafter, the container was transported by Burlington Northern Railroad ("Burlington") by rail to Chicago, where it arrived on September 11, 1995.

Fox contracted with T&T Transfer, Inc. ("T&T") to deliver the container from Burlington's rail yard in Chicago to Fox's facility in Evanston. On September 13, 1995, the container, with the seal intact, was delivered to T&T at Burlington's rail yard and transported to T&T's secured facility for overnight storage. The container, with the seal intact, arrived at T&T's secured facility and was stored by backing it up flush against other containers, rendering it physically impossible to move the cargo through the container's doors, and the chassis for the container was secured by a device designed to prevent movement. T&T delivered the container, with the seal intact, to Fox's Evanston facility on September 14, 1995.

After the seal was broken and the cargo counted, it was discovered that there was a shortage of 213 cartons containing 2,556 men's flight jackets. On September 15, 1995, Bessler, on behalf of Fox, gave written notice to Burlington, pursuant to COGSA Section 3(6), that the cargo was delivered short. On September 15, 1995, the container was retrieved on behalf of Hanjin and removed from Fox's facility.

On September 22, 1995, Mr. Thomas Maude, a surveyor who investigated the short delivery on behalf of Fox, concluded that, based on foreign governmental documents from the Republic of the Philippines, "the loss occurred, in all probability, at the port of Manila [while in Hanjin's custody]".[1] Mr. Maude did not have an opportunity to inspect the container or the seal.

## III

The Carriage of Goods by Sea Act ("COGSA") applies to all cargo shipments which are carried by sea to or from the United States. 46 U.S.C.App. §§ 1300–1315. "[I]t is well recognized that one of Congress' objectives in enacting Cogsa was generally to enhance the currency negotiability of ocean bills of lading." *Portland Fish Company v. States Steamship Co.*, 510 F.2d 628, 632 (9th Cir. 1974). "Cogsa was lifted almost bodily from the Hague Rules of 1921, as amended by the Brussels Convention of 1924.... Those Rules, as amended by the Convention, were in turn derived largely from the pioneering Harter Act of 1893, 46 U.S.C. §§ 190–196." *Id.* at 631 n. 3. (internal quotations and citations omitted).

■ To establish a prima facie case under COGSA, the shipper must prove that the cargo was delivered to the carrier in good condition and the carrier delivered the cargo in damaged or short condition. *American Home Assurance Co. v. American President Lines Ltd.*, 44 F.3d 774, 777 (9th Cir.1994) (citing *Complaint of Damodar Bulk Carriers, Ltd.*, 903 F.2d 675, 683 (9th Cir.1990)); *The Daido Line v. Thomas P. Gonzalez, Corp.*, 299 F.2d 669, 671 (9th Cir.1962). After the prima facie case is made, "[t]he burden of explanation falls upon the carrier. However, Cogsa relieves the carrier from liability for damages arising from certain causes, and the carrier may meet the shipper's prima facie case by showing that the damages were attributable to such a cause." *The Daido Line*, 299 F.2d at 671.

Under COGSA, the carrier shall, on demand of the shipper, issue a bill of lading, which "shall be prima facie evidence of the receipt by the carrier of the goods as therein described...." 46 U.S.C.App. §§ 1303(3) and (4). Further, COGSA expressly provides that "no carrier, ... shall be bound to state or show in the bill of lading any marks, number, quantity or weight which he has reasonable ground for suspecting not accurately to represent goods actually received, or which he had no reasonable means of checking." 46 U.S.C.App. § 1303(3)(c).

■ "[I]n the usual cargo-damage case the shipper makes the showing of good condition on shipment sufficient for its prima facie case by introducing a 'clean' bill of lading." *The*

---

**1.** Since Mr. Maude's opinion was based, in part, on foreign governmental documents from the Republic of the Philippines, his opinion is not without weight, as Hanjin argues.

*Daido Line,* 299 F.2d at 671. A bill of lading which contains no language qualifying the acknowledgment of the apparent good order and condition of the cargo is known as a "clean" bill of lading. Hall, Sahn and Katzman, 2A *Benedict on Admiralty,* ¶ 33 (7th Ed. Rev.1995).

In the Ninth Circuit, a bill of lading with a disclaimer such as "particulars declared by shipper," "shipper's weight," or "said to be" does not render an otherwise clean ocean bill of lading "foul." *Portland Fish,* 510 F.2d at 633 & n. 15. Here, the words "SHIPPER'S LOAD & COUNT" on the face of the bill of lading do not change the nature of the bill of lading from a "clean" bill to a "foul" one. *G.F. Company v. Pan Ocean Shipping Co. Ltd.,* 23 F.3d 1498, 1506 (9th Cir.1994); *Portland Fish,* 510 F.2d at 633 & n. 15; *Westway Coffee Corp. v. M.V. Netuno,* 675 F.2d 30, 32 (2d Cir.1982).

Furthermore, the bill of lading shows on its face that the cargo consisted of 448 cartons of men's jackets and weighed 6218 kilograms. Thus, under Section 3(4) of COGSA, plaintiff has made a prima facie showing that Hanjin received cargo consisting of 448 cartons of men's jackets weighing 6218 kilograms. As the Ninth Circuit has noted, "[s]ome commentators have suggested that the 'prima facie' provision of section 3(4) of Cogsa is intended to make the bill of lading impeachable as between the shipper and carrier, but not as between the carrier and a bona fide purchaser. This is in accord with Cogsa's purpose to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers inter se in international trade. It is also in accord with the provision in section 3(5) of Cogsa that the carrier's right to indemnity from the shipper shall in no way limit his responsibility and liability under the contract of carriage to any person other than the shipper." *Portland Fish,* 510 F.2d at 632 n. 12 (internal quota-

tions and citations omitted). Thus, between a bona fide purchaser, such as Fox, and the carrier, the carrier is estopped to deny that the bill of lading is not prima facie evidence of receipt of the cargo as described in the bill of lading. *See id.* at 632–33 ("The continued vitality of the estoppel doctrine clearly serves the significant congressional objective bracket of enhancing the currency and negotiability of ocean bills of lading.")

Nevertheless, Hanjin argues that the bill of lading issued for the cargo is not a clean bill of lading and, thus, plaintiff has not established the first prong of its prima facie case. To support its position, Hanjin relies on *Plastique Tags, Inc. v. Asia Trans Line, Inc.,* 83 F.3d 1367 (11th Cir.1996). Hanjin's reliance on *Plastique* is misplaced and its argument is without merit. In the Eleventh Circuit, unlike the Ninth Circuit, a bill of lading with a disclaimer such as "shipper's load and count" is not a "clean" bill of lading. *Plastique,* 83 F.3d at 1369. This legal conclusion was the basis for the decision in *Plastique,* and it renders both the rationale of the decision and the decision itself inapplicable.

Hanjin further argues, however, that because the cargo, here, was containerized and the bill of lading listed the number of cartons and weight of the cargo, which Hanjin could not verify, the bill of lading does not constitute prima facie evidence of receipt by the carrier of the goods described therein. There is no merit to this argument. First, under Section 3(3)(c) of COGSA, Hanjin could have refused to state the number of cartons and weight on the bill of lading. Second, Hanjin could have weighed the container in Manila, thereby verifying its weight; Hanjin chose not to do so. *Westway,* 675 F.2d at 33. Third, there is no reason why the rationale and holding of *Portland Fish* are not applicable to containerized cargo.[2]

---

2. This Court is aware, of course, that the Ninth Circuit specifically noted, on denying a rehearing that its decision in Portland Fish did not specifically address containerized cargo, *See Portland Fish,* 510 F.2d at 634 ("[I]t appears that the issues sought to be raised in such [rehearing] briefs concern the possible effect of our decision on the ocean transportation of containerized car-

goes—those in sealed 'packages' not normally opened and inspected by the carrier at the time he issues a bill of lading.... Since the case before us involves solely a bulk shipment subject to piece count, the questions thus raised will have to wait another day for decision. We intimate no opinion on them."); however, that does not prevent the rationale set forth in *Portland*

*See, e.g., Leather's Best Int'l Inc. v. M/V Lloyd Sergipe,* 760 F.Supp. 301, 308–309 (S.D.N.Y.1991) (consignee established prima facie case where carrier signed bill of lading listing the weight of containerized shipment); *Hartford Fire Ins. Co. v. M/V Savannah,* 756 F.Supp. 825, 827 (S.D.N.Y.1991) (consignee established prima facie case for a short delivery, and was entitled to summary judgment, where bill of lading listed weight); *Austracan (U.S.A.) Inc. v. Neptune Orient Lines. Ltd.,* 612 F.Supp. 578, 583 (S.D.N.Y.1985) (bill of lading with weight of containerized shipment established prima facie evidence of receipt of weight by shipper); *Continental Distrib. Co., Inc. v. M/V Sea–Land Commitment,* 1992 A.M.C. 1743, 1994 A.M.C. 82 (S.D.N.Y.1992) (bill of lading's stated specifications of quantity and weight of sealed container is prima facie evidence carrier received cargo listed in bill of lading; carrier could have refuted evidence if it had weighed cargo on delivery and discharge and there was no significant difference).

▮▮▮ Separate and apart from the bill of lading, Fox has shown, through exhibits 1 and 3 through 5 attached to Cammarano's declaration, that it can prove the first prong of its prima facie case, that the cargo was delivered to the carrier in good condition.[3] Pursuant to Fed.R.Evid. 201, this Court takes *sua sponte* judicial notice of exhibit 1, a legislative enactment by the Congress of the Republic of the Philippines establishing the Subic Bay Metropolitan Authority ("SBMA") as a governmental agency and, accordingly, overrules Hanjin's objections to exhibit 1. Hanjin's objections to exhibits 3 through 5 are also overruled and these exhibits are admitted into evidence under Fed. R. of Evid. 902(3), which provides that evidence of authenticity as a condition precedent to admissibility is not required with respect to foreign public documents accompanied by a

final certification of genuineness from an authorized government official or, if the documents are not certified, they may be treated as presumptively authentic if the parties have been given reasonable opportunity to investigate the authenticity and accuracy of the documents and there is a showing of good cause. *United States v. Regner,* 677 F.2d 754, 758–59 (9th Cir.1982); *Raphaely Int'l. Inc. v. Waterman Steamship Corp.,* 972 F.2d 498, 502–03 (2nd Cir.1992). Exhibits 3 through 5 show that Deko was granted by SBMA an export permit to ship 448 cartons of men's MA–1 jackets, 12 pieces per carton, and that on August 10, 1995, Edwin C. Cabbab, an official checker and employee of SBMA, personally observed and checked the loading of the cargo into the container, and the sealing of the container, and certified under penalty of perjury that the sealed container held cargo consisting of 448 cartons of men's MA–1 jackets, 12 pieces per carton. Hanjin's objections to exhibits 2 and 6 are sustained.[4] Exhibit 5 further shows that the container was to be transported on or about August 13, 1995, on Hanjin Yokohama to Chicago. Although exhibits 3 through 6 may be admissible as business records under Fed. R. of Evid. 803(6), *Raphaely,* 972 F.2d at 502; *Melridge, Inc. v. Heublein,* 125 B.R. 825, 830 (D.Or.1991), proper authentication as business records has not been submitted by Fox, and there is no other basis for the admission of Exhibit 6. Exhibit 2 is not a business record and is merely hearsay. Fed.R.Evid. 801, 802.

Hanjin also argues that Fox cannot establish the second prong of its prima facie case, that the cargo was delivered in short condition. To support its argument, Hanjin cites *Bally, Inc. v. M.V. Zim America,* 22 F.3d 65 (2nd Cir.1994). Hanjin's reliance on *Bally* is misplaced and its argument is without merit.

---

*Fish* from applying to COGSA claims on containerized cargo.

3. Hanjin objects to all of the exhibits attached to Cammarano's declaration on the grounds they are without authentication and are hearsay. At the hearing on the motion for summary judgment, the Court examined the originals of these exhibits and observed the embossed seals by the Subic Bay Metropolitan Authority showing that

some of the exhibits are government documents. This Court, thus, finds that Hanjin's objections are sustained, in part, and denied, in part, as discussed herein.

4. There is no competent evidence establishing that Customs Officer Francisco Frandoza accompanied the cargo from the Subic Bay Freeport Zone, where it was loaded, to the port of Manila, as set forth in Exhibit 2.

First, *Bally* was an appeal after a full trial, not a motion for summary judgment, and the appellate court was reviewing findings and determinations made by the trial court. *Id.* at 70. Second, the Second Circuit, in reaching its decision, relied in part on the consignee's failure to give timely notice of loss, which created a presumption that the carrier delivered the cargo in good order. *Id.* at 71. Lastly, although the Second Circuit held that there was insufficient evidence to support a short delivery, it found delivery occurred when the cargo was delivered to the consignee's agent. *Id.* at 69.

Here, Hanjin argues that delivery occurred when the cargo was discharged by Burlington at its rail yard, rather than when it was delivered to Fox's agent, T & T.[5] There is no legal authority in the Ninth Circuit to support Hanjin's position.[6] To the contrary, the COGSA cases speak solely of delivery of the cargo to the consignee. *American Home,* 44 F.3d at 777; *Damodar,* 903 F.2d at 683; *The Daido Line,* 299 F.2d at 671.

■■■ Hanjin also contends that the bill of lading establishes delivery at the time the cargo was discharged by Burlington at its rail yard. Bills of lading are contracts of adhesion, usually drafted by the carrier and, therefore, strictly construed against the carrier. *All Pacific Trading, Inc. v. Vessel M/V Hanjin Yosu,* 7 F.3d 1427, 1431 (9th Cir. 1993). Any ambiguity in the bill of lading must be construed in the favor of the shipper and against the carrier. *Id.* at 1431–32. Here, Clauses 2 and 13 in the bill of lading appear to be conflicting and are, thus, pat-

ently ambiguous; it is unclear whether Hanjin's responsibility for the cargo continued until the cargo was delivered to T & T. The ambiguity requires this Court to find that Hanjin had actual custody of the cargo, within the meaning of Clause 2(c) of the bill of lading, until Burlington, Hanjin's agent, delivered the cargo to Fox's agent, T & T, two days after the cargo was discharged at Burlington's rail yard. *All Pacific,* 7 F.3d at 1431–32. Further, COGSA provides that any contract agreement lessening the statutory liability of the carrier is null and void.[7] 46 U.S.C. § at 1303(8). If under COGSA, as interpreted by the Ninth Circuit, delivery does not occur until the cargo is delivered to the consignee, then conflicting clauses in the bill of lading are null and void.

The plaintiff has established that from the time T & T took delivery of the cargo until the time it was physically delivered to Fox, the container and the seal remained intact. Thus, it is as likely as not that the shortage occurred some time other than after delivery to T & T. Moreover, it may be that, as determined by Mr. Maude, the theft occurred while the cargo was held by Hanjin in the port of Manila.

■■■ Lastly, Hanjin argues that even assuming that Fox has made a prima facie case, the facts demonstrate that Hanjin was free from any fault or negligence and, thus, absolve Hanjin from liability under Section 4(2)(q) of COGSA.[8] Because the seal remained intact throughout the time the container was in Hanjin's custody, Hanjin argues, no fault existed on Hanjin's part. This cannot be found at the summary judgment

---

5. Hanjin, in fact, does not argue that when the cargo was delivered to its Manila port it did not have actual custody of the cargo or that its liability under COGSA did not begin until the cargo was actually placed on the carrier.

6. Even if the loss occurred after discharge but before delivery, i.e., when the cargo was in the custody of Burlington, the duty of care still lies with the carrier under the Harter Act, 46 U.S.C. §§ 190–196, which imposes a non-waivable duty of care upon the carrier during the post-discharge and pre-delivery period.

7. Here, for example, Clause 8 in the bill of lading is clearly null and void. Some of the definitions such as Merchant may be void, as well.

8. Section 4(2)(q) provides that: "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from-

(q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault nor neglect of the agents or servants of the carrier contributed to the loss or damage." 46 U.S.C.App. § 1304(2)(q)

stage. It is as likely as not that the cargo was tampered with while in Hanjin's custody, as opined by Mr. Maude, as at any other time. Further, merely because the container with an intact seal was delivered by Hanjin "does not conclusively prove that loss did not occur while the container was in the carrier's possession." *Bally*, 22 F.3d at 70; *Westway*, 675 F.2d at 33. Thus, Hanjin has not shown that, as a matter of law, it is entitled to summary judgment under Section 4(2)(q) of COGSA.

█ For the foregoing reasons, Hanjin has not shown that plaintiff Fox is unable to prove essential elements of its claim or that Hanjin is entitled to summary judgment under Section 4(2)(q) of COGSA. Clearly there are genuine issues of material fact in dispute as to, among other things, when the loss to the cargo occurred. This Court in this decision expresses no opinion regarding the claims involving DSL or the cross-complaint.

### ORDER

Hanjin Shipping Company, Ltd.'s Motion for Summary Judgment under Fed.R.Civ.P. 56 against Fox and Associates, Inc. is DE-NIED.