**PORTLAND FISH COMPANY, a corporation, Plaintiff-Appellant,**

v.

**STATES STEAMSHIP COMPANY, a corporation, Defendant-Appellee.**

**No. 73-1897.**

United States Court of Appeals, Ninth Circuit.

Sept. 30, 1974.

Rehearing Denied Dec. 24, 1974.

---

William F. White, of White, Sutherland, Brownstein & Parks, Portland, Or., for plaintiff-appellant.

Erskine Wood, of Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for defendant-appellee.

## OPINION

Before KOELSCH and KILKENNY, Circuit Judges, and McGOVERN,* District Judge.

KOELSCH, Circuit Judge:

Pursuant to its agreement to purchase frozen tuna from a seller in the Philippines, Portland Fish Company, the plaintiff, deposited an irrevocable letter of credit with a Manila bank, authorizing payment to seller of $562.50 per short ton of fish upon presentation of a bill of lading.

Thereafter, seller delivered some fish to States Steamship Company, the defendant (hereafter Carrier), for carriage and received from the latter its bill of lading. Carrier verified by piece count the number of fish received, but, having no facilities for weighing them, accepted seller's weight. This information was reflected in the bill as follows:

| "SAID TO BE: | | SAID TO WEIGH: |
|---|---|---|
| IN BULK | 30 SHORT TONS CLIPPER YELLOW FIN TUNA GILLED & GUTTED SAID TO CONTAIN: 519 PIECES | 60000 Lbs. 30 SHORT TONS |

Immediately underneath appeared this endorsement:

" 'One Lot frozen fish said to contain 519 pieces said to weigh 60,000 lbs., freight charges to be adjusted on basis of properly certified outturn weights when such outturn weights are found to be three (3%) percent or more in excess of or under Bill of Lading weights.' "

Seller then presented its sight draft with bill of lading and supporting documents to the Manila bank, which paid him for 30 short tons of tuna. However, Carrier, upon reaching its destination, outturned 580 fish, which weighed only 12.825 short tons.[1]

Plaintiff commenced this suit in admiralty to recover from Carrier the amount of the difference between the sum paid to Seller against the letter of credit and the value of the cargo outturned. Plaintiff's theory was that Carrier was estopped to impeach the weight shown in its bill of lading. The district court rejected plaintiff's contention and ruled that, since the Carrier had outturned all of the fish received from shipper, plaintiff should take nothing on its claim against Carrier and that Carrier should recover (on its counterclaim) against plaintiff the value of the 61 fish delivered plaintiff by mistake. Plaintiff appeals from the ensuing judgment. We reverse.

Ocean bills of lading in foreign trade are given effect subject to the provisions of the Carriage of Goods by Sea Act (Cogsa), 46 U.S.C. §§ 1300–1315.[2]

---

* The Honorable Walter T. McGovern, United States District Judge for the District of Western Washington, sitting by designation.

1. The overplus in number apparently resulted from the commingling of other fish with those received from seller.

2. All the provisions of Cogsa that are pertinent to this matter appear in Section 3 (46 U.S.C. § 1303) and read as follows:
    "(1) * * *
    "(2) * * *
    "(3) After receiving the goods into his charge the carrier, or the master or agent

Carrier's primary contention, upheld by the district court, is that the provision in Section 3, subsection 4, of Cogsa, making a carrier's bill of lading "prima facie evidence" of the receipt of the goods, connotes a rebuttable presumption merely, and thus precludes estoppel. We disagree.

■ This circuit, as well as others, has consistently held the doctrine of estoppel applicable in cases arising under Cogsa and its predecessor, the Harter Act.[3] Daido Line v. Thomas P. Gonzalez Corp., 299 F.2d 669, 673 n. 9 (9th Cir. 1962); Demsey & Associates v. S. S.

Sea Star, 461 F.2d 1009, 1015 (2d Cir. 1972);[4] Cummins Sales & Service, Inc. v. London & Overseas Insurance Co., 476 F.2d 498, 500, 501 (5th Cir. 1973). A good discussion of the early development of the estoppel doctrine as it pertains to bills of lading is contained in District Judge Woolsey's opinion in The Carso, 43 F.2d 736 (S.D.N.Y.1930).

Cogsa was enacted against the backdrop of the Federal Bill of Lading (Pomerene) Act of 1916, 49 U.S.C. §§ 81–124. Section 22 of the Pomerene Act, 49 U.S.C. § 102,[5] amounts to a codification of the estoppel principle and would be dispositive here,[6] were it not

---

of the carrier, shall, on demand of the shipper, issue to the shipper a bill of lading showing among other things—

"(a) * * *

"(b) Either the number of packages or pieces, or the quantity or weight, as the case may be, as furnished in writing by the shipper.

"(c) The apparent order and condition of the goods: *Provided*, That no carrier, master, or agent of the carrier, shall be bound to state or show in the bill of lading any marks, number, quantity, or weight which he has reasonable ground for suspecting not accurately to represent the goods actually received, or which he has had no reasonable means of checking.

"(4) Such a bill of lading shall be prima facie evidence of the receipt by the carrier of the goods as therein described in accordance with paragraphs (3)(a), (b), and (c), of this section: *Provided*, That nothing in this chapter shall be construed as repealing or limiting the application of any part of sections 81–124 of Title 49.

"(5) The shipper shall be deemed to have guaranteed to the carrier the accuracy at the time of shipment of the marks, number, quantity, and weight, as furnished by him; and the shipper shall indemnify the carrier against all loss, damages, and expenses arising or resulting from inaccuracies in such particulars. The right of the carrier to such indemnity shall in no way limit his responsibility and liability under the contract of carriage to any person other than the shipper."

3. Cogsa "was lifted almost bodily from the Hague Rules of 1921, as amended by the Brussels Convention of 1924, 51 Stat. 233." Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 301, 79 S.Ct. 766, 769, 3 L.Ed.2d 820 (1959). Those Rules, as amended by the Convention, were in turn derived largely

from the pioneering Harter Act of 1893, 46 U.S.C. §§ 190–196. *Id.*, at 301 n.5, 79 S.Ct. 766, 3 L.Ed.2d 820.

We follow the "universal practice" of citing Harter Act cases to Cogsa points, where applicable, Gilmore & Black, The Law of Admiralty 127 (1957). *See, e.g.*, Knauth, Ocean Bills of Lading 408–409 (1953); Longley, Common Carriage of Cargo 19–21 (1967); Tokio Marine & Fire Insurance Co. v. Retla Steamship Co., 426 F.2d 1372 (9th Cir. 1970), at 1376–1377.

4. Spanish American Skin Co. v. The Ferngulf, 143 F.Supp. 345 (S.D.N.Y.1956), aff'd, 242 F.2d 551 (2d Cir. 1957), relied upon by the court below, is not to the contrary. No claim of estoppel was there raised, and the Second Circuit has recently reaffirmed the vitality of the estoppel doctrine. *See Demsey & Associates, supra*, 461 F.2d at 1015.

5. 49 U.S.C. § 102 provides in part:

"§ 102. *Liability for nonreceipt or misdescription of goods.*

"If a bill of lading has been issued by a carrier or on his behalf by an agent or employee the scope of whose actual or apparent authority includes the receiving of goods and issuing bills of lading therefor for transportation in commerce among the several States and with foreign nations, the carrier shall be liable to * * * (b) the holder of an order bill, who has given value in good faith, relying upon the description therein of the goods, or upon the shipment being made upon the date therein shown, for damages caused by the nonreceipt by the carrier of all or part of the goods upon or prior to the date therein shown, or their failure to correspond with the description thereof in the bill at the time of its issue."

6. *See, e.g.*, Pacific Micronesian Lines, Inc. v. New Zealand Insurance Co., 366 F.2d 333

for the inapplicability of the Pomerene Act to bills of lading issued in foreign ports.[7] Nevertheless, the proviso contained in section 3(4) of Cogsa, 46 U.S.C. § 1303(4), expressly prohibits a construction of Cogsa which would limit or repeal the effect of the Pomerene Act, and the legislative history of Cogsa evidences a congressional concern for the continued prevention of such abuses as the Pomerene Act was designed to eliminate.[8] We consider it highly unlikely that Congress intended that carriers be held to different standards of care in the issuance of bills of lading covered by the Act, depending solely on the location of the port of issuance, particularly where one of the primary purposes of Cogsa was the establishment of uniformity in bills of lading and the definition by law of the rights and duties of water carriers in foreign trade.[9]

■ Moreover, it is well recognized that one of Congress' objectives in enacting Cogsa was generally to enhance the currency and negotiability of ocean bills of lading. *See, e. g.,* Daido Line v. Thomas P. Gonzalez Corp., *supra,* at 673 n. 9; Spanish American Skin Co. v. The Ferngulf, 242 F.2d 551, 553 (2d Cir. 1957); Kupfermann v. United States, 227 F.2d 348, 350 (2d Cir. 1955); George F. Pettinos, Inc. v. American Export Lines, 68 F.Supp. 759, 764 (E.D.Pa.1947), aff'd, 159 F.2d 247 (3d Cir. 1947).[10] As stated in Gilmore & Black, The Law of Admiralty (1957), at 125–126:

"Cogsa allows a freedom of contracting out of its terms, but only in the direction of *increasing* the shipowner's liabilities, and never in the direction of diminishing them. This apparent onesidedness is a common-sense recognition of the inequality in bargaining power which both Harter and Cogsa were designed to redress, and of the fact that one of the great common carriers to sign bills of lading receipting for illustration for a certain number of bales of cotton, on the shipper's assurance that the cotton would later be delivered to the carrier. The shipper would then dispose of the bill of lading through the usual discounting procedure. Sometimes with intent to defraud and sometimes merely through financial inability as a result of rise in price, and shipper would fail to deliver the cotton. The courts held the fact that the goods had not actually been received to be an adequate defense to relieve the common carrier of liability. This loophole led to frauds on a large scale until the Pomerene Act finally made them impossible by providing that the carrier shall be liable for goods receipted for by its representatives, even though they may not actually have been received. All interests concerned appear to agree upon the importance of preserving this effect of the Pomerene Act." *See also* Hearings on S. 1152 relating to the Carriage of Goods by Sea before the Senate Comm. on Commerce, 74th Cong., 1st Sess. (1935), at 27.

(9th Cir. 1966), 397 F.2d 236 (9th Cir. 1968); Williston on Contracts § 1081, 130 n.9 (3d ed. 1967).

7. Section 1 of the Pomerene Act, 49 U.S.C. § 81, provides:
"Bills of lading issued by any common carrier for the transportation of goods in any Territory of the United States, or the District of Columbia, or from a place in a State to a place in a foreign country, or from a place in one State to a place in another State, or from a place in one State to a place in the same State through another State or foreign country, shall be governed by this chapter."
*See also The Carso, supra,* 43 F.2d at 744–745.

8. S. Rep. 742, 74th Cong., 1st Sess. (1935), contains the following explication of the proviso in section 3(4) of Cogsa, at 1–2:
"The [proviso] is intended to preserve in effect the provisions of the Pomerene Act which hold a carrier liable for receipt of goods signed for by its representatives even though they may not actually have been received, this provision of the Pomerene Act having been found necessary to prevent abuses that were being practiced with damage resulting due to the negotiable character of the bill of lading.
"Prior to the enactment of the Pomerene Act a number of cases had arisen in which shippers had induced representatives of

9. *See* H.R.Rep. 2218, 74th Cong., 2d Sess. (1936), at 1, 5–7. *See also* Knauth, *supra* n.3, at 118–131, 136.

10. *See generally* S.Rep. 742, *supra* n.8; H.R.Rep. 2218, *supra* n.9; and Hearings, *supra* n.8.

objectives of both Acts is to prevent the impairment of the value and negotiability of the ocean bill of lading. Obviously, the latter result can never ensue from the increase of the carrier's duties." (Emphasis in original.)

The continued vitality of the estoppel doctrine clearly serves this significant congressional objective.

█ It should perhaps be noted that Cogsa expressly provides the means by which carriers, in case of doubt concerning the goods, may protect themselves and avoid liability if they choose to do so. Thus (to reiterate) section 3 contains the provision "[t]hat no carrier, master, or agent of the carrier, shall be bound to state or show in the bill of lading any marks, number, quantity, or weight which he has reasonable ground for suspecting not accurately to represent the goods actually received, or which he has had no reasonable means of checking." Accordingly, under the

Pomerene Act or, in the case of inbound bills, under the doctrine of estoppel, such statements as the carrier does make become conclusive as against a holder in due course.[11]

█ Of course we recognize that the party urging estoppel against the carrier must demonstrate that he has relied on the description that appears in the bill, for it is elementary that, absent reliance, there can be no estoppel. Thus the doctrine is not applicable in a suit by a shipper against a carrier,[12] or where reliance on the description by a holder for value is not reasonable,[13] or where the holder does not rely on the description at all.[14] But here plaintiff's reliance is manifest and was fully justified. The bill was "clean"—the qualification "said to weigh" did not befoul it.[15]

The judgment is reversed, and the cause is remanded with directions to enter judgment for plaintiff.

11. Carrier urges that the proviso was unavailable because the Philippines-American Traffic Act required the weight endorsement which appears at the bottom of the bill. The point is not well taken. First, the relevant tariff provision concerned simply freight charges, and the endorsement was no part of the description itself; second, the provision had no application: it required an endorsement only with respect to "shipments of frozen fish shipped in bulk as 'one lot' not subject to piece count and when freight is not charged on a weight basis . . ."

12. See Dal International Trading Co. v. The SS Milton J. Foreman, 171 F.Supp. 794 (E. D.N.Y.1959). See also American Trading Co. v. The Harry Culbreath, 187 F.2d 310 (2d Cir. 1951); Strohmeyer & Arpe Co. v. American Line SS Corp., 97 F.2d 360 (2d Cir. 1938).

Some commentators have suggested that the "prima facie" provision of section 3(4) of Cogsa is intended to make the bill of lading impeachable as between the shipper and carrier, but not as between the carrier and a bona fide purchaser. See Longley, supra n. 3, at 18–21; Knauth, supra, n.3, at 390–391. This is in accord with Cogsa's purpose "to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers inter se in international trade." Herd & Co. v. Krawill Machinery Corp., su-

pra, 359 U.S. at 301, 79 S.Ct. at 769. H.R. Rep. 2218, supra n.9, at 1. It is also in accord with the provision in section 3(5) of Cogsa that the carrier's right to indemnity from the shipper "shall in no way limit his responsibility and liability under the contract of carriage to any person other than the shipper." But cf. Poor on Charter Parties and Ocean Bills of Lading § 64 (5th ed. 1968), at 161.

13. See, e. g., Austin Nichol & Co. v. Isla de Panay, 267 U.S. 260, 273, 45 S.Ct. 269, 69 L.Ed. 603 (1925); Tokio Marine & Fire Insurance Co. v. Retla Steamship Co., supra n.3, 426 F.2d at 1378.

14. See, e. g., Freedman v. The Concordia Star, 250 F.2d 867, 869 (2d Cir. 1957).

15. It has been held repeatedly that disclaimers such as "particulars declared by shipper," "shipper's weight," or "said to be" do not render an otherwise clean ocean bill of lading "foul." Spanish American Skin Co. v. The Ferngulf, 143 F.Supp. 345, 349–350 (S. D.N.Y.1956), aff'd, 242 F.2d 551, 554 (2d Cir. 1957); American Trading Co. v. The Harry Culbreath, 187 F.2d 310, 313 (2d Cir. 1951); George F. Pettinos, Inc. v. American Export Lines, 68 F.Supp. 759, 764 (E.D.Pa. 1947), aff'd, 159 F.2d 247, 248 (3d Cir. 1947). See Gilmore & Black, supra n.3., at 106–107.

## ORDER ON REHEARING

■ On rehearing, several ocean carriers have moved for leave to file briefs *amicus curiae*. However, it appears that the issues sought to be raised in such briefs concern the possible effect of our decision on the ocean transportation of containerized cargoes—those in sealed "packages" not normally opened and inspected by the carrier at the time he issues a bill of lading. The motions are denied. Since the case before us involves solely a bulk shipment subject to piece count, the questions thus raised will have to wait another day for decision. We intimate no opinion on them. Appellee's petition contains nothing new; the points reiterated have all been covered—in our opinion, correctly—in our earlier opinion.

The petition for rehearing is denied.

KILKENNY, Circuit Judge, would grant the rehearing, recall the opinion and affirm the judgment of the lower court.