WESTWAY COFFEE CORPORATION, Plaintiff,

v.

M.V. NETUNO, her engines, boilers, etc.,

v.

COMPANHIA DE NAVEGACAO MARITIMA NETUMAR, Defendants.

80 CIV 332 (LBS).

United States District Court, S. D. New York.

Sept. 15, 1981.

**114**

Bigham, Englar, Jones & Houston, New York City, for plaintiff; John E. Cone, Jr., Helen M. Benzie, William R. Connor, III, New York City, of counsel.

Cichanowicz & Callan, New York City, for defendants; Michael J. Carcich, Joseph F. DeMay, New York City, of counsel.

## OPINION

SAND, District Judge.

This case involves the mysterious disappearance of 419 cartons of instant coffee from a sealed container, consigned to plaintiff from Brazil to New York on the M.V. Netuno. A trial to the Court has been held and this opinion constitutes the Court's findings of fact and conclusions of law.

## FACTS

Plaintiff Westway Coffee Corporation placed an order for 1710 cartons of instant coffee from Dominium, S.A. of Sao Paulo, Brazil. Dominium obtained six containers from defendant Companhia De Navegacao Maritima Netumar ("Netumar"), owner of the M.V. Netuno, in connection with the shipment consigned to plaintiff. The empty containers were driven by truck to the Santos scale, where they were weighed to determine their tare. (Dos Santos Dep. at 7; da Silva Dep. at 14; Mello Dep. at 17). The containers were then taken to a warehouse in Sao Paulo, Brazil, owned and controlled by COBEC, a Brazilian government organization. The containers were loaded at the COBEC warehouse, under the supervision of an official of the Brazilian Coffee Institute, the Brazilian governmental agency in charge of coffee exports, who certified (Plaintiff's Exhibits 15A–F) that each container was loaded with 285 cartons of instant coffee, and sealed the containers, which were then padlocked. *See* Barros Dep. at 6–8. The containers were then driven to Santos, Brazil, approximately 60 kilometers away. At Netumar's request and expense, the containers were weighed on May 28 and 29, 1979, before entry to the Eud Marco Terminal Warehouse. The weights of all six containers corresponded to the presence of 285 cartons of instant coffee in all six containers. The containers remained in the Eud Marco Warehouse until June 7, 1979. Although the Eud Marco

Warehouse General Manager testified that it was Netumar's practice to request weighing of the containers upon exit from the warehouse, if they had been in the warehouse for more than two days, Netumar did not request that these containers (which were in the warehouse for at least seven days) be weighed upon exit from the terminal warehouse.

On June 7, 1979, the containers were driven to the vessel and loaded by ship's gear, and Netumar issued a bill of lading (plaintiff's exhibit 21) dated June 7, 1979, reflecting shipment of the six containers.[1] The bill of lading lists the serial numbers of the containers and their gross weight, and the following typed description: "S.T.C. [said to contain] each 285 boxes with soluble coffee spray." The gross weights listed are consistent with all six containers containing 285 boxes of coffee.[2] Three legends have been stamped on the bill of lading: "Said to contain (STC)"; "Shipper's load and count (SLAC); and "Contents of packages are shipper's declaration." The efficacy of these legends is a major dispute between the parties, which will be resolved *infra.*

Defendant's employees testified that the containers were sealed and locked when they were loaded on the M.V. Netuno, and that the two containers involved in this action were stowed in hatch 4, central cell, in the upper tween deck of the vessel. The M.V. Netuno arrived in New York on June 25, 1979 and the containers were discharged at Pier 36, East River, New York City, on June 26, 1979.

On June 25, 1979, Chemical Bank presented Westway with a sight draft payable in 120 days for acceptance, with supporting documents, including the June 7, 1979 bill of lading. After reviewing the supporting documents, Westway accepted the draft, and Chemical Bank held the draft until October 23, 1979 when payment was due. Westway paid the draft when it became due.

On June 27 or 28, 1979, the six containers, seals and locks intact, were opened on Pier 36 for sampling. Four of the containers were filled to capacity (285 cartons), but containers CTIU 294907 and CTIU 412376 were not full. It was ultimately determined that the two containers held 419 cartons less than the number listed in the bill of lading and Westway's order from Dominium. Westway duly notified Netumar of the claimed shortage on June 29, 1979. This lawsuit followed.[3]

## DISCUSSION

■ Under Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300 *et seq.*, a consignee establishes a prima facie case by proving "delivery of the goods to the carrier . . . in good condition, and outturn by the carrier . . . in damaged condition." *Vana Trading Co. v. S.S. "Mette Skou",* 556 F.2d 100, 104 (2d Cir.) *cert. denied* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977) (quoted in *Caemint Food, Inc. v. Lloyd Brasileiro Companhia De Navegacao,* 647 F.2d 347, 352 (2d Cir. 1981)). The burden then shifts to the carrier to establish "that the loss or damage falls within one of the COGSA

---

1. An almost identical document entitled "Bill of Lading" (plaintiff's Exhibit 30) which bears a stamp dated May 30, 1979 has also been submitted. While the exact significance of this stamp or this copy of the bill of lading has not been resolved by the evidence, plaintiff's exhibit 30 appears to be an internal Netumar document, which is used to apprise the ship what cargoes it should accept on board. We thus have no difficulty interpreting the May 30, 1979 date stamped on this document as an indication that Netumar either received or prepared the bill of lading on May 30, 1979 and, after affixing the stamp to it, transmitted it to the ship. This document was not negotiated to plaintiff, and plaintiff has not established that it relied on it, and we therefore accord it no significance.

2. The weight listed for container FVIU–202354 is significantly lower than that of the other containers because that container is constructed of a lighter material than the others. In any event, this case involves containers CTIU 294907 and CTIU 412376, for which the gross weights listed are consistent with a load of 285 boxes of coffee.

3. We of course deal in this suit only with the rights of plaintiff and defendant. Defendant's rights, if any, against the shipper are not involved in this suit.

exceptions set forth in 46 U.S.C. § 1304(2)." *Id.* at 105. If the carrier satisfies this burden, "the burden then returns to the . . . consignee to 'show that there were . . . concurrent causes of loss in the fault and neglect of the carrier.'" *Id.* (citations omitted).

■ Plaintiff contends that the weights stated in the June 7, 1979 bill of lading constitute "prima facie evidence of the receipt by the carrier of the goods as therein described," 46 U.S.C. § 1303(4); *see Woodhouse Drake & Carey (Trading), Inc. v. S.S. "Hellenic Challenger"*, 472 F.Supp. 31, 33 & n.4 (S.D.N.Y.1979); that it was entitled to rely on the weights stated in the bill of lading which was duly negotiated to it; and that Netumar is estopped from claiming that the missing cartons of coffee were not in the containers when Netumar took possession of them.[4]

Defendant contends that plaintiff has failed to prove delivery of the full quantity to the carrier, and thereby has failed to establish a prima facie case; and alternatively, that defendant has established that it exercised proper care; and that plaintiff's estoppel theory does not apply to cases involving sealed containers.[5] These contentions are based largely on the disclaimers contained in the bill of lading, and on the fact that the goods were "hidden" within the containers.[6]

We reject defendant's position for the reasons succinctly stated by Judge Weinfeld in *Woodhouse, supra*, 472 F.Supp. at 33–34:

COGSA provides the answer to defendant's contention. Section 1303(3) provides:

> After receiving the goods into his charge the carrier, or the master or agent of the carrier, shall, on demand of the shipper, issue to the shipper a bill of lading showing among other things—
>
> .  .  .  .  .
>
> (b) Either the number of packages or pieces, or the quantity or weight, as the case may be, as furnished in writing by the shipper.
>
> (c) The apparent order and condition of the goods: *Provided*, That no carrier, master, or agent of the carrier, shall be bound to state or show in the bill of lading any . . . quantity, *or weight* which he has reasonable ground for suspecting not accurately to represent the goods actually received, or which he has had no reasonable means of checking. (Emphasis supplied)

As our Court of Appeals has said of this section: "[The Act] specifically provides a method for avoiding carrier liability for false information given by the shipper, by not stating it in the bill. . . . The carrier must utilize that method, rather than the quite general reservation attempted here."[5] Thus if defendant has reason to doubt the shipper's weights, it was required to use the method for limiting liability expressly provided by COGSA

---

**4.** Plaintiff also contends that Netumar is liable to it because of its status as a holder in due course of the bill of lading. While we agree that Netumar is estopped from contesting the presence of the coffee in the containers upon delivery to the ship, even assuming that the New York Uniform Commercial Code were to govern this question, plaintiff did not take the bill of lading free of the defenses provided by COGSA, which were specifically incorporated in the bill of lading. *See* New York UCC § 7–501.

**5.** Defendant inexplicably bases this last contention on *Portland Fish Co. v. State Steamship Co.*, 510 F.2d 628, 634 (9th Cir. 1974), in which the court denied a rehearing and stated that it "intimated no opinion" with respect to the impact of its decision on containerized cargoes

which may not be opened and inspected by the carrier when the bill of lading is issued. *Id.* In any event, defendant's inability to open the containers and inspect their contents is irrelevant to this case, because this case involves the presence of the missing cargo, not its condition, and because defendant had the alternative of weighing the containers to verify that they contained the consigned cargo. Similarly, this case is unlike *Caemint, supra*, which involved an inherent concealed vice in the cargo.

**6.** As already noted, weighing of the containers provided an adequate alternative to opening the containers and counting the boxes, and the condition of the boxes or the cargo contained in the boxes, is not in issue.

and cannot now advance the general statement in the bills, "said to weigh," against the consignee. Since plaintiff relied on the weights specified in the bills in purchasing the consignment, defendant is estopped from denying the accuracy of the description contained therein.[6]

[5] *Spanish American Skin Co. v. The Ferngulf*, 242 F.2d 551, 553 (2d Cir. 1957); *accord, Portland Fish Co. v. States Steamship Co.*, 510 F.2d 628, 633 (9th Cir. 1974); *cf. American Trading Co. v. The Harry Culbreath*, 187 F.2d 310, 313 (2d Cir. 1951) (shipper was agent of consignee).

[6] *Portland Fish Co. v. States Steamship Co.*, 510 F.2d 628, 633 (9th Cir. 1974); *see Demsey & Associates v. S.S. Sea Star*, 461 F.2d 1009, 1015 (2d Cir. 1972).

We thus find that despite the disclaimers stamped on the bill of lading, the weights recited in the bill established prima facie receipt by the carrier of the entire shipment of coffee. *See also Palmco, Inc. v. American President Lines*, 1978 A.M.C. 1715, 1717 (D.Oregon 1978); *Baby Togs v. S.S. American Ming*, 1975 A.M.C. 2012, 2018 (S.D.N.Y. 1975).[7] Moreover, Netumar is estopped to deny receipt of the full shipment listed in the bill of lading because plaintiff relied on the representations therein when it accepted the draft.[8]

Plaintiff having satisfied its initial burden, the burden thus shifts to defendant to establish the applicability of a COGSA exception. Defendant contends that it has satisfied this burden by demonstrating that it exercised "proper care," relying on the catchall exception contained in 46 U.S.C. § 1304(2)(q). Defendant must therefore prove that it was free from negligence. *Nissho-Iwai Co. v. M/T Stolt Lion*, 617 F.2d 907, 913 (2d Cir. 1980).

We find the testimony produced by defendant with respect to the loading of the containers on the Netuno, their stowage on the ship, and the operation of Pier 36 insufficient to satisfy that burden. We find as a matter of fact that there were significant periods of time when the container could have been pilfered as to which defendant provided no evidence, most notably during loading and the voyage (which included stops in three other ports, *see* Santos Dep. at 11)[9] and during discharge. Moreover, we find the testimony with respect to the general security measures taken on Pier 36 insufficient to establish defendant's freedom from negligence, especially in view of the testimony that coffee was an item in high demand on Pier 36 and easily saleable to salvors during this period of time. Gornell Dep. at 81–82; Tr. at 36. Finally, the fact that the unnumbered seals and locks (Plaintiff's Exhibit 43) were intact when the loss was discovered is not conclusive. First, the seals, which consist of wire and a seal stamped IBC but have no identifying number or unique characteristic, could be easily duplicated. Second, as the testimony indicated and as other courts have recog-

7. Defendant also contends that we should give effect to the provision of the Pomerene Act, 49 U.S.C. § 101, which relieves the carrier from the conclusive effect of weights stated in bills of lading when these disclaimers are used, although the Pomerene Act by its terms applies only to shipments originating in the United States. 49 U.S.C. § 81. Defendant argues that Congress could not have intended carriers to be held to different standards depending on where the bill of lading is issued. We reject this contention because both the Pomerene Act and COGSA clearly define the scope of their applicability, and this case falls clearly within the scope of COGSA, not the Pomerene Act. *See Elgie & Co. v. S.S. "S. A. Nederburg"*, 599 F.2d 1177, 1180 (2d Cir. 1979) ("On shipments originating outside the United States and thus not covered by the Pomerene Act, a carrier is bound by its representations concerning on-board quantities.") (citations omitted) *cert. de-*

*nied* 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980).

8. Plaintiff's payment of the draft when it became due, although after discovery of the loss, is of no relevance to this lawsuit. *See The Carso*, 43 F.2d 736, 745 (S.D.N.Y.1930), *aff'd in part, rev'd in part on other grounds*, 53 F.2d 374 (2d Cir.) *cert. denied* 284 U.S. 679, 52 S.Ct. 140, 79 L.Ed. 574 (1931).

9. There was testimony that the door of the container could only be opened 8 inches while it was in the hold. Santos Dep. at 10, 17–18. However, no explanation of the derivation of this figure was given, and the testimony was insufficient to establish that there was no time during the loading and stowage process or during the voyage that the containers could have been pilfered.

nized, the locks used on these containers could have been picked. *See Baby Togs, supra,* 1975 A.M.C. at 2017. Plaintiff's efforts to establish the means by which the containers could have been opened without disturbing the seals or locks were "gratuitous," *Nissho-Iwai Co., supra,* 617 F.2d at 913, and any questions we may have with respect to the amount of noise accompanying the sawing of a bolt or other problems with plaintiff's theory do not aid defendant. In sum, we find that defendant has not proved its freedom from negligence, and plaintiff is entitled to damages for the non-delivery of the coffee.[10]

It may well be the case, despite the certificates and weighings, that the missing cargo was not in fact within the containers when it came into defendant's custody. The inherent nature of estoppel is to preclude a party from asserting what may in fact be the truth. The missing cargo, therefore, is deemed to be within the container whether as a matter of fact or as a legal fiction. Defendant is thus called upon to demonstrate that the absence of what may in fact never have been there in the first place is not attributable to its negligence. This is not to say that defendant is absolutely liable; such a conclusion would clearly be contrary to COGSA, which explicitly allows the defense of non-negligence. But if one is precluded from reasoning that the cargo was not in the container before it was loaded, one is left only with the possibility that it was stealthily removed. It is difficult to envision precisely how this took place. Plaintiff's courtroom demonstration of how the container door might have been removed by use of a saw or other means was not persuasive. There is no evidence that containers of this type have ever been pilfered in the manner indicated by plaintiff's expert; it would take time, sophistication, and would create a good deal of noise, in addition to being quite cumbersome.

How the coffee (which may not have been there to begin with) was removed remains a mystery worthy of Houdini. However, it seems likely that the theft was an inside job involving some internal corruption causing or contributing to the loss (*e.g.,* duplicating of seals, failing to weigh the containers at dockside or on discharge, or some other such circumstance). If one hypothesizes that the theft was an inside job, and the possibility of corruption prior to issuance of the bill of lading is eliminated by operation of the estoppel doctrine, the burden on defendant to show its freedom from negligence is indeed difficult to satisfy.

If defendant had succeeded in showing that the extent of surveillance, fencing, internal security measures, and other security measures were such that pilferage could not readily have been accomplished on the pier or during the voyage, we would conclude that, although the precise technique utilized by the thief is still unknown, the defendant had absolved itself of any negligence. But defendant's showing falls far short of this and the extent of pilferage, especially of coffee, is a matter of record. Since defendant is estopped from denying that the coffee was within the container when it came into its custody, and has not shown that it adopted security measures which would have effectively precluded the inference that the cargo was stolen, plaintiff's prima facie case has not been adequately rebutted, and plaintiff is therefore entitled to recover its damages.

Defendant has not disputed plaintiff's calculation of the amount of damages, and we therefore adopt it. Plaintiff should recover $138,316.09, which includes the invoice price of the nondelivered coffee, the ocean freight, and demurrage.

■ Plaintiff seeks prejudgment interest on the damages awarded. "Although the allowance of prejudgment interest in admi-

---

10. Defendant has not contended that it should be relieved from responsibility under COGSA because the containers were on the pier, rather than on the ship, when the shortage was discovered. *Cf. Phillip Brothers Metal Corp. v. S. S. "Rio Iguazu",* 658 F.2d 30, 32 & n.2 (2d Cir. 1981) (carrier remained liable to consignee up to time consignee took delivery; thereafter, consignee's arrangement with stevedore used by carrier constituted new bailer-bailee relationship).

ralty is said to be a matter committed to the trial court's discretion, . . . it should be granted in the absence of exceptional circumstances," *Mitsui & Co. v. American Export Lines, Inc.*, 636 F.2d 807, 823 (2d Cir. 1981) (citations omitted), and should run from the date of anticipated delivery, *id.* at 824. No exceptional circumstances are present here, and we therefore grant prejudgment interest to run from the date of anticipated delivery, at the rate of 10%, which will adequately compensate plaintiff. *See Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980); *Federal Barge Lines, Inc. v. Republic Marine, Inc.*, 616 F.2d 372 (8th Cir. 1980) (10%); *Sabine Towing and Transportation Co. v. Zapata Ugland Drilling, Inc.*, 553 F.2d 489 (5th Cir.) *cert. denied* 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977) (12%).

Settle order on notice by September 30, 1981.

SO ORDERED.