RAPHAELY INTERNATIONAL, INC., et al., Plaintiffs,

v.

WATERMAN STEAMSHIP CORPORATION, et al., Defendants.

No. 82 Civ. 6284 (RO).

United States District Court, S.D. New York.

May 21, 1991.

Bigham Englar Jones & Houston, New York City (Louis G. Juliano, Frederick A. Lovejoy, of counsel), for plaintiffs Raphaely Intern., Inc., et al.

Burlingham Underwood & Lord, New York City (Joseph C. Smith, Matthew Q. Berge, of counsel), for defendant Waterman S.S. Corp.

Schoeman, Marsh & Updike, New York City (Charles B. Updike, of counsel), for defendant Societe Generale de Surveillance, S.A.

## OPINION AND ORDER

OWEN, District Judge:

This action involves the shipment of peanuts aboard three cargo vessels owned and operated by defendant Waterman Steamship Corporation from the Sudan to Norfolk, Virginia during the spring of 1981. Waterman, through its agent, Gezira Trade & Services Co., Ltd., issued bills of lading which contained representations that the bags of peanuts were free of fly/weevils, free from mould, and contained aflatoxin [1] not exceeding 5 p.p.b. Upon arrival of the vessels at Norfolk, all of the cargoes were rejected, either because of beetle infestation or excessive aflatoxin contamination. Raphaely, the purchaser of the peanuts, and the insurance underwriters assert claims against Waterman and its vessels for delivering damaged cargo. Raphaely asserts claims against Societe Generale de Surveillance, S.A., the inspection service, for negligence and breach of warranty in its inspection of the cargo. By this motion, Raphaely moves for partial summary judgment against Waterman on the issue of liability, based on failure to deliver goods that conformed with representations contained in the bills of lading. Societe moves for summary judgment against Raphaely on the grounds of collateral estoppel and lack of contract.

---

1. Aflatoxin is a carcinogenic substance excreted by a mold which often grows in peanuts. United States guidelines regulating the importation of peanuts prohibit the entry of cargo containing levels of aflatoxin in excess of 25 parts per billion.

Raphaely contracted for the purchase of approximately 4000 metric tons of peanuts from Agrimpex Co., Ltd., the seller, to be delivered in the Spring of 1981. During April and May 1981, Waterman and its lash vessels,[2] the Stonewall Jackson, Benjamin Harrison and Robert E. Lee accepted delivery of several consignments of peanut cargoes at port Sudan. Following acceptance of the cargo, Waterman, through its agent Gezira, issued order bills of lading.[3] The bills of lading, in addition to the standard "received in apparent good order and condition" clause, also contained express representations as to the condition of the cargo. The bills of lading K Norfolk 7 through 10 (Stonewall Jackson), K Norfolk 9 (Benjamin Harrison), and K Norfolk 1 through 11 (Robert E. Lee) contained the following statement under "Description of Packages and Goods":

BAGS SUDANESE HPS GROUNDNUT KERNELS, COUNT 70/80 PER OUNCE, 1980/81 CROP, PURE BASIS, FREE OF ANY ADMIXTURE, FREE OF SHRIVELLED KERNELS, FREE OF FLY/WEEVILS, FREE FROM DAMAGED AND DECAYED KERNELS, FREE FROM MOULD, CONTAINING MAXIMUM 3 PCS. SPLIT AND BROKEN NUTS. AFLATOXIN NOT EXCEEDING 5 P.P.B.

The bills of lading K Norfolk 11 through 14 issued by the Stonewall Jackson contained the following statement under "Description of Packages and Goods":

BAGS SUDANESE GROUNDNUT KERNELS COUNT 70/80 HPS PER OUNCE 1980/81 CROP PURE BASIS FREE OF FLY/WEEVILS DAMAGE AND DECAYED KERNELS CONTAINING MAXIMUM 3 PERCENT SPLIT AND BROKEN NUTS FROM MOULD.[4]

Upon arrival of the vessel Stonewall Jackson at Norfolk on May 2, 1981, the cargo of peanuts, transported under bills of lading K Norfolk 7 through K Norfolk 10, was rejected and refused entry into the United States because of Khapra beetle infestation. Subsequent tests also revealed that the cargo was contaminated with aflatoxin at levels in excess of 25 p.p.b. The remaining cargo on board the Stonewall Jackson, transported under bills of lading K Norfolk 11 through K Norfolk 14, was inspected by the U.S. Department of Agriculture and rejected because it was found to contain levels of aflatoxin in excess of 25 p.p.b. Upon arrival of the vessel Benjamin Harrison at Norfolk on May 14, 1981, the cargo of peanuts transported under bill of lading K Norfolk 9 was rejected because it, too, was found to contain aflatoxin levels in excess of 25 p.p.b. Upon arrival of the vessel Robert E. Lee at Nor-

2. LASH is an acronym for Lighter Aboard Ship. The peanuts are first loaded onto LASH barges. The barges are then towed offshore, assembled in staging or fleeting areas along with other barges carrying other cargoes, and subsequently loaded aboard LASH vessels for overseas shipment.

3. Bills of lading K Norfolk 7 through K Norfolk 14 were issued for the Stonewall Jackson; K Norfolk 1 through K Norfolk 11 were issued for the Robert E. Lee; and K Norfolk 9 was issued for the Benjamin Harrison.

4. Copies of the bills of lading were submitted by Louis Juliano, counsel for Raphaely, along with his affidavit in support of Raphaely's Motion for Summary Judgment. At oral argument, Mr. Juliano presented to the court an original bill of lading, of which the copy was an exact duplicate. Counsel for Waterman, Joseph Smith, submitted different bills of lading which he claimed were received by Waterman from its agent in port Sudan. These bills of lading,

notably, do not contain the express representations as to the condition of the cargo. Mr. Smith stated that these bills of lading cast doubt on whether the bills submitted by Raphaely are genuine and authentic. Despite Mr. Smith's purported doubt as to the authenticity of the bills offered by Raphaely, the documents, themselves, do not leave any doubt. The bills offered by Raphaely bear the signature of Gezira, Waterman's agent in the Sudan, a date of receipt, and a duty stamp. In contrast, the "newly discovered" bills offered by Mr. Smith are unsigned, undated and unstamped making them non-negotiable. No genuine doubt exists as to the validity of the bills offered by Raphaely. I accept the bills submitted by Raphaely as true and accurate copies of the authentic originals. I decline to accept Mr. Smith's representations to the contrary, being unsupported by any affidavit from a witness with knowledge and based upon legally deficient documents allegedly discovered two days before oral argument in a case pending since 1982.

folk on May 30, 1981, the cargo of peanuts transported under bills of lading K Norfolk 1 through K Norfolk 11 was similarly rejected because of aflatoxin levels in excess of 25 p.p.b.

Raphaely moves for partial summary judgment on the ground that the representations contained in the bills of lading proved to be untrue and Waterman, the ocean carrier, is estopped from denying these representations or from asserting any defense based on alleged pre-shipment damage which would contradict the representations contained in the bills of lading. The Waterman bills of lading are subject to the Carriage of Goods by Sea Act (Cogsa), 46 U.S.C.App. §§ 1300–1315. Raphaely bases it motion on Section 1303(4) of Cogsa which provides that "a bill of lading shall be prima facie evidence of the receipt by the carrier of the goods as therein described...." Raphaely argues that Waterman should now be estopped from offering evidence to show that it did not receive the cargo in the condition represented in the bills of lading or that the damage was due to a preexisting defect.

■■■ While it is true that statements made by a carrier in its bills of lading are conclusive as against a holder in due course, and the carrier is estopped from offering contradictory evidence, *Portland Fish Co. v. States Steamship Co.*, 510 F.2d 628, 633 (9th Cir.1974), a question of fact exists as to whether Raphaely was an innocent holder in due course who purchased the bills of lading in reliance upon the representations contained therein. In order for the estoppel doctrine to apply, the party urging estoppel must be the purchaser of the bills of lading, the party must have relied on representations contained in the bills of lading in making its purchase, and the cargo carried under the bills of lading must have arrived in a condition that did not conform with representations made in the bills of lading. *Id.* "[T]he doctrine does not apply in a suit by a shipper against a carrier, or where reliance on the

description by a holder for value is not reasonable, or where the holder does not rely on the description at all." *Id.*

■■■ At this stage and on this record, the total extent of Raphaely's role in the purchase and transport of the peanuts from the Sudan to the United States is unclear. Documents and depositions submitted indicate that Raphaely was involved in arranging for the inspection and shipment of the peanuts from the Sudan. Eric Hoffman, Raphaely's vice president, went to the Sudan to meet with representatives of Societe to arrange for the inspection of the peanuts. Raphaely required and obtained inspection certificates verifying that the peanuts were free of fly weevils, mould, and aflatoxin, and that the barges were fumigated. Another Raphaely representative, Oliver Purves, was present in the Sudan prior to loading the peanuts aboard the Waterman vessels. Purves stated in a deposition that his duties were to check the quality of the peanuts, to see that they were properly inspected, to see that the barges were fumigated, and to supervise the loading of the lash barges to ensure that the peanuts got the maximum ventilation during the ocean voyage. Raphaely was responsible for arranging the shipping space and paying all freight charges and it was Raphaely that entered into the contract for ocean transport with Waterman. To protect itself against the risk of rejection, Raphaely purchased through Agrimpex full rejection insurance from the plaintiff underwriters. Raphaely's involvement in arranging for the inspection and shipment of the peanuts indicates that Raphaely was not simply an innocent purchaser making payment for the peanuts in sole reliance upon representations contained in the bills of lading. Thus, the estoppel doctrine may well not apply with Waterman being permitted to introduce at trial evidence of the condition of the goods at the time it accepted delivery as well as evidence of pre-shipment damage or "inherent vice"[5] of the peanuts. Accordingly, Ra-

---

**5.** Section 1304(2) of Cogsa provides that "[n]either the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

... (m) [w]astage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods...." An inherent

phaely's motion for partial summary judgment against Waterman is denied.

### Societe's Motion for Summary Judgment

■ Defendant Societe moves for summary judgment to dismiss Raphaely's claim for negligent inspection and issuance of false certifications on the grounds of collateral estoppel and lack of contract. Societe bases its collateral estoppel argument on a prior arbitration, held in Antwerp, Belgium between Raphaely and the plaintiff underwriters. Societe claims that the arbitrators, in ruling for Raphaely and against the underwriters, found that the inspection certificates issued by Societe were valid and the aflatoxin developed during transport of the cargo. However, the arbitrators did not address the issue whether the representations contained in the certificates were accurate, but rather considered only the question whether Raphaely had obtained the certificates as required by the warranty provisions and was therefore covered by the insurance contract. The decision of the arbitrators states,

> Whereas the S.G.S. certificate definitely binds the parties and the underwriters cannot be allowed to "prove against the S.G.S. certificate;

> \*      \*      \*      \*      \*      \*

> Whereas the production of these certificates constitutes undeniable proof of compliance with the warranty, ...

In the present action, Raphaely and the underwriters specifically challenge the validity of the inspection certificates issued by Societe. The arbitrators did not decide this question. Moreover, because the validity of the certificates was not at issue, the arbitrators did not necessarily determine the condition of the cargo prior to loading; rather the representations contained in the certificates were accepted as true. The arbitrators' comments with regard to the development of excess levels of aflatoxin

during transport were not necessary findings to the arbitrators determination that Raphaely had complied with the warranty requirements. Thus, the findings of the arbitrators are not binding in this action against Societe and collateral estoppel does not apply.

■ Societe also argues for summary judgment on the ground that no contract existed between Raphaely and Societe, but rather that the inspection in Sudan was conducted by Gezira which, although sometimes acts as an agent for Societe, in this instance was acting independently. In opposition, Raphaely represents that it dealt with Societe delegates to arrange for the sampling, inspection and testing of the peanuts, and that Societe, not Raphaely contacted Gezira to perform the inspection services.

Although no written contract between Raphaely and Societe is submitted, other evidence, including several telexes between Raphaely and Societe, indicates that Raphaely and Societe entered into an oral agreement for Societe to arrange inspections for the benefit of Raphaely and that Societe performed such services on Raphaely's behalf. Eric Hoffman of Raphaely testified in a deposition that he travelled to the Sudan in March 1981 where he met with Societe's Colin Kay and Aad Knoester and reached an agreement for the provision of inspection services. Raphaely submits a telex sent to Societe's Geneva headquarters, confirming Hoffman's agreement with Kay and Knoester reached during this meeting. Raphaely also submits a reply telex from Societe acknowledging receipt of the April 2 telex and asking for clarification with regard to inspection requirements and seeking confirmation of "all costs of our interventions in p.s. entirely for yr account." This telex was followed by a reply from Raphaely which included the statement, "[W]e insist to have an aflatoxin

---

vice is "any existing defect, disease, decay or the inherent nature of the commodity which would cause it to deteriorate over a lapse of time." *United States Steel International, Inc. v. Granheim,* 540 F.Supp. 1326, 1329–1330 (S.D.N.Y. 1982), citing *Missouri Pacific Railroad v. Elmore*

*& Stahl,* 377 U.S. 134, 139, 84 S.Ct. 1142, 1145, 12 L.Ed.2d 194 (1964). Waterman claims that aflatoxin is an inherent vice of peanuts occurring as a result of mold spores in the growing fields and environment.

analysis by reputable independent internationally recognized laboratory, such as your selves. [A]s we request you to do sampling and other inspection, we are certain that you will be able to do and comply with the strict warranties concerning sampling. [I]t goes without saying that all cost attached to the above work/interventions you will do on our behalf, will be at our expense. [I]n this regards, kindly advise us approximate cost of same." Finally, in a telex of April 21, Societe represented to Raphaely that, "Certificates of weight, quality and aflatoxin hv been duly issued by our agents ..." The language in these telexes strongly indicates that a contract existed between Raphaely and Societe for inspection services to be performed by Societe's agents, in compliance with instructions sent by Raphaely to Societe, with payment to Societe for the performance of these services. Certainly, this evidence is sufficient to raise an issue of fact with regard to Societe's claim that no contract existed.

Accordingly, Societe's motion for summary judgment based on collateral estoppel or lack of contract is denied.

### Bifurcation

■ Finally, the parties raise the issue of whether the trial in this action should be bifurcated. Raphaely and Waterman both move for bifurcation, while Societe opposes bifurcation. This case is an admiralty action and no reason exists to forego the usual practice of bifurcating the trial. The extensive evidence necessary to prove liability is distinct from the evidence necessary to prove damages. Accordingly, no prejudice will be suffered by any party by bifurcation, and the trial on liability will proceed first as scheduled on June 17, 1991.

So Ordered.