**HARTFORD FIRE INSURANCE COMPANY and Sunland, Inc., Plaintiffs,**

**v.**

**M/V "SAVANNAH", its engines, boilers, etc., K.G. Ivarans Rederei B.m.b.H. & Co. and Ivaran Lines, Defendants.**

**IVARAN LINES, Defendant and Third–Party Plaintiff,**

**v.**

**Rederei Claus–Peter OFFEN, Third–Party Defendant.**

**No. 88 Civ. 5552 (CSH).**

United States District Court, S.D. New York.

Feb. 20, 1991.

[redacted]

Donovan Maloof Walsh & Repetto, New York City (Edward C. Radzik, of counsel), for plaintiffs.

Lilly Sullivan Purcell Barkan & Junge, P.C., New York City (Peter A. Junge, of counsel), for defendant Ivaran Lines.

Thomas H. Healy, New York City, for M.V. "SAVANNAH".

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

In this admiralty action alleging short delivery of cargo, plaintiffs move for summary judgment under Rule 56, Fed.R. Civ.P.

### Background

In December 1987 plaintiff Sunland, Inc., a New York corporation, purchased a quantity of Brazilian cashew nuts from Cia. Industrial de Productos Alimenticios ("CIPA") in Fortaleza, Brazil. The shipment consisted of 500 cartons of first quali-

ty large whole cashews priced at $2.95 per pound F.O.B. vessel at Fortaleza, and 200 cartons of first quality pieces priced at $1.25 per pound. The total F.O.B. invoice purchase price was U.S. $86,250. Sunland paid CIPA for the cashews through an irrevocable letter of credit issued by Chase Manhattan Bank in New York for the full purchase price, payment to be made upon CIPA's presentation of specified documents, including a full set of on board clean ocean bills of lading.

The complaint alleges that although the shipment was F.O.B. vessel, CIPA arranged for the ocean transportation of the goods from Fortaleza to New York with defendant Ivaran Lines through the latter's agents at Fortaleza. Sunland insured the cargo for physical loss and damage during transit with plaintiff Hartford Fire Insurance Company under an open marine cargo policy.

On December 19, 1987 Marnosa Navegacao Ltda., acting "for and on behalf of the Master", and "as agents only," issued at Fortaleza an Ivaran Lines bill of lading reflecting the loading of the 700 cartons of cashews on board the M.V. "SAVANNAH." The printed form bill of lading recites: "Particulars Furnished by Shipper of Goods." The typed description of goods says:

1 (One) Container 20 FT said to contain 700 cartons brazilian cashew kernels as follows:

500 Cartons cashew L.W. 1's

200 Cartons cashew P 1's

In a column bearing the printed caption "gross weight in kilos," there is typed opposite the reference to 500 cartons the figures "12.000." Opposite the reference to 200 cartons, there is typed "4.800," and then a total figure of "16.800." It is common ground that the bill of lading shows the weight of the 700 cartons of cashews to be 16,800 kilos, the equivalent of approximately 37,037 pounds. The bill of lading does not recite the weight of the 20-foot container into which the 700 cartons were placed prior to loading on board the vessel.

The bill of lading contains stamped notations which recite "House to House Move-

ment;" "Shipper's Loads and Count;" and "Quality, Quantity and Weight as Declared by Shippers." The face of the bill of lading also contains this stamped paragraph:

Carrier received the above container(s) locked and/or sealed and did not open the container(s). Carrier did not tally the container's contents nor did it weigh them. The weights or quantity stated on this bill of lading are simply those stated by the shipper and are not deemed to have been issued by the carriers.

The bill of lading identifies the shipper as CIPA.

On the back of the bill of lading this printed provision appears:

11(a) This Bill of Lading shall be prima facie evidence of the receipt by the Carrier of the goods as herein described insofar as he had reasonable means of checking the particulars as furnished by the shipper. In respect of such particulars, proof to the contrary shall not be admissible when this document has been transferred for value to a third party who in good faith relied on the accuracy of the aforesaid particulars.

The bill of lading recites that the container number was IVLU 707528–8 and bore seal number IVL–30865.

The "SAVANNAH" proceeded on her voyage to New York. Robert Natale, Sunland's traffic manager, made arrangements for a trucker to pick up the container at the Red Hook Marine Terminal in Brooklyn and deliver it to Commodity Warehouse in Linden, New Jersey, a public warehouse where Sunland warehouses its goods. On January 11, 1988, the trucking company designated by Sunland picked up the container at the Red Hook Marine Terminal. On that date Universal Maritime Service Corp., a stevedoring company, issued a transit interchange receipt ("T.I.R.") which recited, among other things, that the container when delivered to the trucking company had a gross weight of 21,040 pounds. That is a total weight (including the weight of the container) substantially less than the weight of the cashews reflected in the bill of lading, which as noted was 16,800 kilos or approximately 37,037 pounds. A copy of

the T.I.R. is attached to the moving papers as Ex. 8 to the Natale affidavit. Defendant Ivaran has admitted that Universal Maritime Service Corp. was acting for and on behalf of Ivaran Lines in the discharge and delivery of the container in question. *See* defendant's response to Request No. 25 of Requests for Admissions promulgated by plaintiffs pursuant to Rule 36, Fed.R.Civ.P.

Subsequent surveys reveal that 477 of the 700 cartons of cashews shipped were missing. The container door handle had been tampered with and was in such condition that the container door could be removed without breaking the seal affixed at the loading port.

Hartford settled Sunland's claim for $79,-103.38, representing the C.I.F. value plus 10% minus the policy deductible of $981.75. Hartford sues by subrogation. The claim asserted in the complaint is for $78,705, representing the alleged market value of the cashews short delivered at $3.30 per pound ex Sunland's warehouse. (All the missing cartons came from the 500 cartons of first quality large whole cashews.) Plaintiffs also claim pre-judgment interest. They contend that they are entitled to summary judgment both as to liability and as to amount of damages.

### Discussion

At the threshold, plaintiffs contend that their motion must succeed because defendants did not file a timely response to plaintiffs' statement under Rule 3(g) of the Civil Rules of this Court. But Ivaran Lines did file a responsive Rule 3(g) statement as part of its motion papers, and I will permit the late filing, preferring to deal with the motion on its merits, rather than resolve it on a technicality.

The issue is therefore whether plaintiffs have satisfied Rule 56(c), which provides in part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Rule 56(e) governs the form of supporting and opposing affidavits, which

shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

■ Plaintiffs attach to their motion papers a number of documents generated at the loading and discharge ports. Counsel for Ivaran Lines and for the vessel challenge the admissibility into evidence of certain of these documents. To the extent that the motion papers do not reveal an adequate foundation for the admissibility of documents at trial, they cannot be considered on a motion for summary judgment. However, there is one document which passes the test of admissibility. That is the Transit Interchange Receipt issued by Universal Maritime Service Corp. on January 11, 1988. As noted, Ivaran Lines has admitted that Universal acted as its stevedore at the port of discharge, performing functions which formed a part of Ivaran's duty as ocean carrier. The T.I.R. was produced from his file during a deposition of Caldo Piccione, Ivaran Lines' claims manager, who identified Universal Maritime Services Corp. as "the New York stevedores." Tr. 14. Ivaran Lines raises no question on this motion as to the authenticity of the copy of the T.I.R. submitted by plaintiffs on this motion. The written notation of the gross weight of the container appearing on that document constitutes a "statement" under Rule 801(a)(1), Fed.R. Evid., and is admissible as an admission by Ivaran Lines under Rule 801(d)(2)(D). The stevedore was Ivaran's "agent" for the purpose of executing the T.I.R., even though it was also an independent contractor.

Thus the T.I.R. establishes a short delivery at the discharge port of the quantity of cashews reflected on the face of the bill of lading issued at the loading port. That is because, as noted, the gross weight of container and cargo reflected on the T.I.R. is less than the amount of cargo reflected on the bill of lading. Short delivery of cargo is a recognized form of damage for which a cargo owner may sue an ocean carrier under the United States Carriage of Goods by Sea Act, 46 U.S.C.App. §§ 1300 et seq., 1303, ("COGSA") which all parties agree applies to the shipment in suit.

■ The decisive question is therefore whether the carrier and vessel are bound by the cargo weights stated in the bill of lading.

Plaintiffs are entitled to summary judgment on the issue of liability. Defendant Ivaran Lines chose to issue a negotiable bill of lading reflecting the receipt on board the "SAVANNAH" of 700 cartons of cashews weighing 16,800 kilos. Sunland's seller having presented that bill of lading to the bank issuing the letter of credit, Sunland was obligated to pay the seller for that quantity, and in fact did so. As the Second Circuit observed in *Berisford Metals Corp. v. S/S Salvador*, 779 F.2d 841, 845 (2d Cir.1985), such a document performs several important offices:

... a negotiable or order bill of lading is a fundamental and vital pillar of international trade and commerce, indispensable to the conduct and financing of business involving the sale and transportation of goods between parties located at a distance from one another. It constitutes an acknowledgement by a carrier that it has received the described goods for shipment. It is also a contract of carriage. As a document of title it controls the possession of the goods themselves.

In particular, the bill of lading in the case at bar acknowledges receipt by the ocean carrier on board its vessel of the weight of goods stated on the bill of lading. The Second Circuit made that point plain enough in *Westway Coffee Corp. v. M.V. Netuno*, 675 F.2d 30, 33 (2d Cir.1982):

Once the carrier lists the weight of the goods (which normally will be readily verifiable by the carrier), he represents that he has no reasonable ground for suspecting that the weight of the goods actually received varies from the listed

weight and that he has reasonable means of checking the weight, 46 U.S.C. § 1303(3)(c)(1976). This is enough for a *prima facie* showing of receipt of the listed weight. 46 U.S.C. § 1303(4) (1976).

As in *Westway,* plaintiffs at bar have established a *prima facie* case under COG-SA. The bill of lading establishes the loaded weight of cashews, and events at the discharge port clearly demonstrate outturn of a lesser weight. Defendants' motion papers show no ground upon which that prima facie case could be rebutted. Markings on the bill of lading such as "Shippers Load and Count" and "Quality Quantity and Weight as Declared by Shippers" do not change that result. *Westway* at 32.[1]

While defendants proclaim the existence of disputed issues of fact, they are not material, and accordingly do not preclude summary judgment. For instance, the bill of lading is marked "House to House Movement," while it is fair to say that plaintiffs treat the shipment as one of "Pier to House." But the different loading port scenarios inherent in these differing descriptions are not material in respect of defendants' liability, since in any event the ocean carrier's issuance of a negotiable bill of lading constituted its acknowledgements that it received the designated weights, and had reasonable means of checking those weights. These are the precise holdings of *Berisford* and *Westway.* And, of course, the ocean carrier acting through its agent at the loading port had means of checking the weights. As Judge Newman observed in *Westway* at 33 n. 4:

> Had Netumar weighed the containers at loading and listed that weight on the bill of lading, and then weighed them again at unloading and found the same weight, it would have a defensible position at least as to a claimed shortage of weight.

Plaintiffs are entitled to summary judgment on the issue of liability. I agree with defendants that the present record does not sufficiently establish valuation for pur-

poses of entry of summary judgment on the amount of damages. Accordingly a reference will be made to a Magistrate–Judge for inquest, recommendation and report.

### Conclusion

The Clerk of the Court is directed to enter summary judgment in favor of plaintiffs and against defendants holding defendants fully liable for all damages suffered by plaintiffs as the result of the shipment alleged in the complaint.

The Court is making a separate order of reference to a Magistrate–Judge. The issues arising out of the third-party complaint are not involved in this motion, and I make no order with respect to them.

It is SO ORDERED.

---

1. Just as in *Westway,* I need not decide whether Ivaran "is in any event estopped from offering evidence to rebut the *prima facie* showing of receipt of the listed weight, established by the

bill of lading (on which ... the consignee relied)." 675 F.2d at 33 n. 3. The language in ¶ 11(a) of the bill of lading at bar would seem to point in that direction.